HOPKINS RODEN CROCKETT
 HANSEN & HOOPES, PLLC
Sean J. Coletti, ISBN 7199
428 Park Avenue
Idaho Falls, Idaho 83402
Telephone:  208-523-4445
Facsimile:  208-523-4474
seancoletti@hopkinsroden.com
Attorneys for Defendant Kot Nam
Shan

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELALEUCA, INC., an Idaho corporation, and MELALEUCA (CHINA) WELLNESS PRODUCTS CO., LTD., a wholly-owned subsidiary of Melaleuca, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> KOT NAM SHAN, an individual, and SHAKLEE CORP., a Delaware corporation, <br><br> Defendants. | Case No. 4:18-cv-00036-DCN <br><br> DECLARATION OF KOT NAM SHAN IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF IDAHO:

I, Kot Nam Shan, declare as follows:

1.    I am the former General Manager of Melaleuca (China) Wellness

Products Co., Ltd. ("Melaleuca (China)").  Melaleuca (China) is a Chinese corporation.

I make this declaration based upon my own personal knowledge, and can testify as to

the truth of the statements contained herein.

2.      I currently reside in Shanghai, China, which is fifteen hours ahead of Pocatello, Idaho in time.  I have lived and worked my entire life in Asia.  I am a citizen of the Hong Kong Special Administrative Region of the People's Republic of China.

3.      With the exception of occasional business travel and leisure travel with my family, I have never lived or stayed in the United States for a prolonged period of time. Cantonese is my first language, Mandarin Chinese is my second language, and English is my third and weakest language.  I currently work for Shaklee (China) Co. Ltd. in its Shanghai office, although I spend approximately 50% of my time in Shanghai and 50% in Beijing.  I have been based in China for work since April 2011.

4.      From approximately May 17, 2010 to April 12, 2011, I worked in Malaysia for Melaleuca Southeast Asia (Malaysia) Sdn. Bhd.

5.      Shortly before I started my employment with Melaleuca Southeast Asia (Malaysia) Sdn. Bhd., I was asked to sign two separate documents:  (1) a Key Employee Non-Interference and Non-Competition Agreement, and (2) a Confidentiality and Non-Solicitation Agreement ("2010 Agreements").   These 2010 Agreements were presented to me in English only, and I signed them in the form they were presented to me.  There was no negotiation about any of the terms in the 2010 Agreements. Although Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. was my sole employer, it is not named as a party to the 2010 Agreements.   Instead, the 2010 Agreements contain only my signature, and they name only Melaleuca Southeast Asia (Malaysia) Sdn. Bhd.'s parent company, Melaleuca, Inc. (and none of its subsidiaries), as a party. Nobody ever told me that I would be an employee of Melaleuca, Inc.

6.      Around early 2011, I decided to accept an employment opportunity with Melaleuca (China) to work back in China.  I had a written labor contract with Melaleuca

(China) only.  Melaleuca (China) initially hired me as an Assistant General Manager of Market Development.  I acted under the direction of General Manager Ted Lin ("Mr. Lin"), who left Melaleuca (China) around June or July, 2011, for a position in Taiwan.  I was promoted to General Manager of Melaleuca (China) soon following Mr. Lin's departure.

7.     At the beginning of my employment with Melaleuca (China), on April 13, 2011, I was again asked to sign two agreements nearly identical to those I had signed before I began my employment with Melaleuca Southeast Asia (Malaysia) Sdn. Bhd.  I signed and executed these agreements ("2011 Agreements") in China.  I did not write, or instruct anyone to write the 2010 Agreements or the 2011 Agreements.

8.     I received the 2011 Agreements in both Mandarin Chinese and English. But again, there was no negotiation about any of the terms in the 2011 Agreements. The 2011 Agreements contained the same titles and dealt with the same subject matters as the 2010 Agreements.  One notable difference between the two sets of agreements is that the non-compete provision in the 2011 Agreements  required Melaleuca (China) to pay me a monthly base compensation in order to impose non-compete obligations on me.

9.     Given that I had ended my employment with Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. before working for my new employer, Melaleuca (China), I understood that my relationship with my new employer would then be guided by the 2011 Agreements.  Nobody told me otherwise until this litigation began and Melaleuca, Inc. alleged that the 2010 Agreements remain binding.

10.    A true and correct copy of the English and Chinese versions of the 2011 Key Employee Non-Interference and Non-Competition Agreement are attached hereto

DECLARATION OF KOT NAM SHAN
IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT          - 3

as Exhibit A.

11.    A true and correct copy of the English and Chinese versions of the 2011 Confidentiality and Non-Solicitation Agreement are attached hereto as Exhibit B.

12.    For convenience, a copy of the 2010 Key Employee Non-Interference and Non-Competition Agreement is attached hereto as Exhibit C. No Chinese version of this document was provided to me.

13.    For convenience, a copy of the 2010 Confidentiality and Non-Solicitation Agreement is attached hereto as Exhibit D. No Chinese version of this document was provided to me.

14.    For over the next six years, I dedicated myself to working for Melaleuca (China) in Shanghai. During this period, all of my compensation came solely from Melaleuca (China). I also was offered a supplemental retirement allowance ("SRA") to be paid 120 days after my Termination Date from Melaleuca (China). Similarly, my compensation during my employment with Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. had come solely from Melaleuca Southeast Asia (Malaysia) Sdn. Bhd., not from Melaleuca, Inc. In essence, Melaleuca, Inc. was never my employer, and I have never to my recollection received compensation from Melaleuca, Inc. I also am not aware that Melaleuca, Inc. ever made any payments to Melaleuca (China) for the use of my services.

15.    I also never viewed Melaleuca, Inc. as my employer. I understood that the key individuals whom I reported to and communicated with, such as Jerry Felton ("Mr. Felton") held positions in Melaleuca (China) and Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. I understand, for example, that Mr. Felton is a Supervisor of Melaleuca (China) and is a member of the board of directors of Melaleuca Southeast

Asia (Malaysia) Sdn.  It was only natural that I would receive business guidance from my employers' officers and directors.

16.     A true and correct copy of a printout from Melaleuca (China)'s corporate record as filed with the Shanghai Administration for Industry and Commerce, which shows that Mr. Felton is a designated Supervisor of Melaleuca (China), along with an English translation, is attached hereto as Exhibit E.

17.     A true and correct copy of a printout of Corporate Information from the Companies Commission of Malaysia for Melaleuca Southeast Asia (Malaysia) Sdn. Bhd., which shows that Mr. Felton is a director of Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. is attached hereto as Exhibit F.

18.     I resigned from Melaleuca (China) in the fall of 2017, and my last day was November 15, 2017.  The resignation certificate I received at the time of my departure from Melaleuca (China) identifies only Melaleuca (China) as my employer.  On January 8, 2018, I began my new and current employment with Shaklee (China) Co., Ltd.

19.     A true and correct copy of the above-referenced resignation certificate, along with an English translation, is attached hereto as Exhibit G.

20.     During my employment with Melaleuca (China), I traveled to the United States once or twice a year, but my contacts with Idaho were limited.  For example, I traveled annually to the United States with Chinese customers for a convention, and we stayed in Salt Lake City, Utah.  I understand that Melaleuca (China) paid for the trip. The convention typically lasted 4-5 days and took place in Salt Lake City.  Typically there would be a short day trip by bus to Idaho for the customers to visit Melaleuca, Inc.'s headquarters and distribution center.  Before the convention, we sometimes would spend 1-2 days visiting another location in the United States (for example, San

Francisco).

21.     Further, during my employment with Melaleuca (China), I did not receive extensive mentoring from Melaleuca, Inc.'s employees in Idaho. Some of my interactions with Mr. Felton were necessary because Mr. Felton was the Supervisor of Melaleuca (China). I also note that Mr. Felton is a Director of Melaleuca Southeast Asia (Malaysia) Sdn. Bhd. With respect to Melaleuca, Inc.'s chief executive officer, Frank VanderSloot, I at most talked to him two hours per year from 2011 to 2017.

22.     In early December, after I left Melaleuca (China), Mr. Felton asked me whether I intended to work for Shaklee. I responded truthfully that I could not guarantee that I would not take any job if a good opportunity came by. Mr. Felton asked me whether I needed a copy of my non-competition and confidentiality agreements, and given that I already had copies of the 2011 Agreements, I said no. Despite the alleged rumors Mr. Felton said he had heard about me and my offer from Shaklee, Mr. Felton never brought up the subject of giving me the extra payments to trigger my non-compete obligations under the 2011 Agreements.

23.     Several weeks later, in January 2018, after I began working for Shaklee (China) Co., Ltd., Mr. Felton contacted me to speak personally, but he later canceled the meeting. I gave every opportunity to Melaleuca (China) to trigger my non-compete obligations through payments of the monthly base compensation. But Melaleuca (China) never even mentioned or brought up the subject of making the required payments for my non-compete obligations.

24.     After I left Melaleuca (China), I never solicited any Melaleuca distributors ("Marketing Executives") to join my new employer, Shaklee (China) Co. Ltd. or encouraged them to leave Melaleuca (China). I talked to some Marketing Executives of

Melaleuca (China) following my departure, but all of these interactions were social in nature and I never tried to convince them to leave Melaleuca (China) or any of its affiliates or to stop buying products from Melaleuca (China). All of these individuals live and work in China.

25.     I have also never breached my confidentiality obligation to Melaleuca (China). Nor have I disclosed any confidential information belonging to Melaleuca, Inc. or any subsidiary of Melaleuca, Inc. I never disclosed Melaleuca, Inc.'s or any of its subsidiary's confidential sales performance or any other confidential information to Shaklee or anyone else. I also understand that annual sales information for direct selling companies in China, including Melaleuca (China), is published online and publicly available. For example, *Knowledge Economy's* 2017 ranking of annual sales for the 90 leading direct selling companies in China is available online at this link: http://uprich.com/index.php?m=Index&a=article&id=5899&type=1. It shows that Melaleuca (China) was ranked 13th out of 90 direct selling companies in China for 2017, with annual sales of RMB 5 billion – an improvement from Melaleuca (China)'s ranking of 21 for 2016. A true and correct copy of a printout of this article, together with an English translation of the row showing Melaleuca (China)'s ranking and a brief description of the data, is attached hereto as Exhibit H.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 23, 2018 at Hong Kong.

/s/   Nelson
Kot Nam Shan

CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of February 2018, I electronically filed the foregoing with the Clerk of the Court using the CME/ECF system which sent a Notice of Electronic Filing to the following person(s):

*Attorneys for Plaintiffs*

*Attorneys for Defendant Shaklee Corp.*

Sean J. Coletti

# EXHIBIT A

## KEY EMPLOYEE
## NON-INTERFERENCE AND NON-COMPETITION AGREEMENT

THIS AGREEMENT IS SIGNED ON _12/06/2011_ (DD/MM/YY) BY THE TWO PARTIES LISTED HEREUNDER:

| | |
|---|---|
| **Party A** | Party A shall also be referred to below as the "Company" or "Employer". |

Name of the Company: Melaleuca (China) Wellness Products Co., Ltd.
Legal of Representative: McKay Christensen

Business License No.: 26000002200812290003

Address: 15F, No. 1988 Gonghexin Road, Shanghai
Tel: 86-21-3387 0222
Fax: 86-21-3387 0822

**Party B**

Name of the Employee: _Nelson Kot_

ID Card No.: _K023229(7)_
Address: _Room 1602, No.6, Alley 10. Yanping Road, China_
Tel: _1391760 7629_
Party B shall also be referred to below as the "Employee".

This Key Employee Non-Interference and Non-Competition Agreement (the "Agreement") is made between the Employee and Melaleuca, Inc., a corporation incorporated under the laws of the state of Idaho in the United States, and all of Melaleuca, Inc.'s successors, assigns, current and former, local and international affiliates including Melaleuca (China) Wellness Products Co., Ltd. ("affiliates" defined to mean entities that own, are owned by, or are under common ownership with Melaleuca, Inc.) (collectively the "Company").

### RECITALS

A.      Employee is currently, or will be, employed by Melaleuca (China) Wellness Products Co., Ltd. in the position of _Assistant General Manager of Market Development_. The services performed by Employee for Company in this position are special and unique and involve a high degree of exposure to the Company's

Initial _____

independent sales force, and/or of specialized training, education and experience. Subsequent title and or responsibility changes shall not affect the applicability or enforceability of this Agreement.

B.      Employee's position with Company is also a position of trust and confidence which allows Employee access to confidential, proprietary and other information. Such information is provided to Employee solely for use in a manner consistent with the best interests of Company and consistent with Employee's duty of loyalty.

C.      Employee acknowledges that he/she is a "key employee" and, as a result of the Company's trust and investment, Employee has and/or is expected to gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation and/or public persona as a representative or spokesperson of the Company.   Employee understands that because of the Company's trust and investment in Employee, Employee has and/or will have a unique ability to harm the Company's legitimate business interests.

## AGREEMENT

For the purpose of protecting the Employers legitimate business interests, the Employer, during the Period of Restriction, shall provide monthly base compensation for non-competition to the Employee every month, and the Employee shall bear all individual income Tax payable by himself or herself in respect of such compensation for non-competition. In the event of termination or expiry of the Contract, Employer has the right to choose whether to require Employee to perform the Non-Competition obligations during the Period of Restriction.   If Employer opts not to require Employee to perform the non-competition obligations during the Period of Restriction, Employer shall not pay the economic compensation for non-competition noted above.

## I.   NON-INTERFERENCE AND NON-COMPETITION COVENANTS

A.      **Definitions.**   The following terms shall be defined as provided below.

1 .      Termination Date.   The phrase "Termination Date" means the effective date of Employee's termination from employment with Company for any reason, whether voluntary or involuntary.   In the event Employee's employment with Company is terminated and Employee is subsequently rehired by Company in

the same or any other position, the phrase "Termination Date" shall refer to the most recent effective date of Employee's termination from employment with Company.

2 .     Period of Restriction.   The phrase "Period of Restriction" shall mean the period commencing on the effective date of this Agreement and continuing during the term of Employee's employment with Company and for a period of eighteen (18) months after the Termination Date.

3 .     Direct Competition.   The phrase "Direct Competition" shall be deemed to include engaging in employment or a line of business with a company, corporation, partnership, entity or person that is engaged in direct selling or multi-level marketing as defined by any applicable law, regulation or agency or by the Direct Selling Association, that produces, packages, sells, markets, distributes or otherwise makes available for public consumption, personal care, home care, cosmetic, over-the-counter pharmaceuticals, foods or nutritional products, including, but not limited to, companies such as Amway, Alticor, Quixtar, NuSkin, Herbalife, Max International, Shaklee, FreeLife, Tahitian Noni, USANA, Xango, Morinda, Mary Kay, Agel and Avon.   Nothing in this Agreement shall be interpreted or construed to prevent Employee from purchasing or holding for investment less than 3% of the outstanding capital stock of any corporation with a class of equity securities which are regularly traded either on a national securities exchange or in the over-the-counter market.

4.     Restricted Area.   The phrase "Restricted Area" shall mean any province, county, city or other recognized geographic area within the People's Republic of China, any territory of the United States and any foreign country in which Company is conducting business at any time prior to the Termination Date; provided that the phrase "Restricted Area" shall not include geographic areas over which the Employee had no responsibility and in which the Employee did not provide services or have a significant presence or influence. For purposes of this definition, the phrase "significant presence or influence" includes but is not limited to making promotional appearances or speaking to the Company's independent sales force, whether on stage, in any public forum, in phone calls, via video presentations, in print, or in any similar manner.

5.     Business Contacts.     The phrase "Business Contacts" shall mean consultants, suppliers, vendors, customers, and Marketing Executives, and the employees, agents and representatives of Company's consultants, suppliers and vendors, any projects or work performed for Company's consultants, suppliers or vendors, and any information or documents concerning potential consultants, suppliers or vendors of Company from whom Company is attempting or has attempted to obtain projects, work, supplies, materials, services or

sales. Business Contacts shall include information and documents regarding the identity or existence of Business Contacts.

**B.**     Non-Interference or Solicitation or Diversion of Business.   During the term of Employee's employment with the Company and for a period of two (2) years from the termination of Employee's employment with the Company for any reason whatsoever, Employee shall not, directly or indirectly, either on his/her own account or for any person or entity, contact, solicit, advise, consult or induce any customer or Marketing Executive of Company for the purpose or with the effect of causing such customer or Marketing Executive to purchase, license or otherwise obtain products or services from, or act as an employee, representative, distributor or independent contractor for, a person, firm, business or entity in Direct Competition with the Company.   Similarly, during the same period, Employee shall not directly or indirectly interfere with the business relationship between Company and any of its customers, Marketing Executives, accounts, dealers, distributors, suppliers, vendors, independent contractors, service providers, or other parties with which Company has business relationships, or induce any such party to terminate its relationship with Company, or to modify the terms of such relationship in a manner adverse to the best interests of Company.

**C.**     Non-Competition.

      i.     During the Period of Restriction and in the Restricted Area, except as specified in Subsection
            C.ii. below, Employee shall not, alone or in association with others, as owner, shareholder,
            employee, officer, director, partner, lender, investor, consultant, principal, agent, independent
            contractor, co-venturer, or in any other capacity, directly or indirectly promote or speak for or
            on behalf of any person, firm, business, or entity in Direct Competition with the Company
            ("Competing Company").   This prohibition specifically includes the following:   1) promoting or
            speaking on behalf of the compensation plan or products of a Competing Company; 2)
            advising or speaking to the Competing Company's independent business owners or sales
            representatives who serve the same or similar function as Company's Marketing Executives
            (Competing Company's "Sales Representatives"), whether on stage, in any public forum, in
            phone calls, via video presentations, in print, or in any other manner; 3) holding himself out as
            formerly employed by Company.   Neither Employee nor any company with which Employee
            becomes affiliated will make any public announcements about Employee's employment or
            other association with the new company, except if Employee's new company is publicly traded

and to the extent it is required to file reports with the China Securities Regulatory Commission or other applicable securities exchange that must disclose Employee's name.   The new company must also agree with Company to abide by this requirement; 4) knowingly contacting or speaking with Company's Marketing Executives or Preferred Customers.   If Employee is contacted by a Company Marketing Executive or Preferred Customer, or if Employee becomes aware that he is speaking with a Company Marketing Executive or Preferred Customer, Employee shall advise that person that Employee cannot interfere with any of Melaleuca's contracts or relationships, end the conversation and immediately notify Melaleuca's legal department of the conversation; and 5) providing information to (except pursuant to a valid court order or relevant administrative order), cooperate with, collaborate with, or assist in any way, any person, firm, business or entity (whether such person, firm, business or entity is in Direct Competition with the Company or not) in connection with any litigation or dispute with Company.

      ii.    Employee may work for a Competing Company during the Period of Restriction and in the Restricted Area only if Employee has no contact with the Competing Company's Sales Representatives in the Restricted Area and abides by the specific prohibitions identified in Subsection C.I.1)-5) above.   This Agreement is not intended to prohibit Employee from obtaining employment or working in a line of business unrelated to the type of employment or line of business conducted by the Employee while working for the Company.

**D.**     <u>Non-Use of Company Affiliation</u>.   During the Period of Restriction, Employee shall not use or allow to be used by any other person or entity his or her name, or any positions he or she has ever had with Company, in connection with the direct or indirect solicitation of any Business Contact, as defined in Section I.A.5., for such other company, person or entity.

**E.**     <u>Duty of Loyalty.</u>   Employee agrees that while employed by Company he/she (a) will not engage in any consulting, employment, business or other activity that is in Direct Competition with the Company, (b) will devote his/her best efforts full time to the performance of his/her duties for Company, (c) will give proper time and attention to furthering Company's business, (d) will be an ambassador for the Company, its business, its products, its management team and its other employees, (e) will comply with all rules, regulations, and instructions established or issued by Company, (f) will not, directly or indirectly, manage, operate or engage in

any business which would detract from Employee's focus and ability to apply his/her best efforts to the performance of his/her duties for Company, (g) will not usurp any corporate opportunities of Company, and (h) will immediately notify the Company each time Employee is contacted by or on behalf of a Competing Company for the purpose of soliciting or enticing Employee to work for such Competing Company. However, Employee may acquire and/or hold interests in (h) a private business or company that is not in Direct Competition with the Company; (ii) any publicly traded company; (iii) mutual fund; (iv) venture capital fund; and (v) similar investment entities.

F.    **No Conflicting Obligations**.   Employee agrees that, during the term of Employee's employment with Company, Employee will not engage in any other employment, occupation, consulting or other business activity in Direct Competition with the Company, nor will Employee engage in any other activities that conflict with Employee's obligations and duties to Company.

G.    **Non-Disparagement**.   During the Period of Restriction, Employee shall not in any way communicate to any third party, either directly or indirectly, anything negative or disparaging about Company, its policies, philosophies, products or personnel.   If Employee violates this covenant, in addition to the remedies set forth in the Agreement, Employee will be obligated to repay to Company severance payments paid by Company, if any, and shall be deemed to waive and will not be entitled to receive any further severance payments owing by Company. The Company reserves the rights to claim for any damage caused.

H.    **Non-Endorsement**.   During the Period of Restriction, Employee shall not in any way, directly or indirectly, endorse any product that competes with products of Company, promote or speak on behalf of any company whose products compete with those of Company, or allow Employee's name or likeness to be used in any way to promote any company or product that competes with products of Company.

I.    **Acknowledgment of Reasonableness of Restrictions**.   Employee acknowledges that Employee's position and work activities with the Company are crucial to the ongoing success of Company's operations. Employee acknowledges further that Employee's employment or involvement with any Direct Competition in particular would create the impression in the minds of Company's employees, customers, and Marketing Executives that Employee has left Company for a better opportunity, which impression would damage Company.   Employee specifically acknowledges and agrees that the nature of the limitations upon Employee's activities as specified herein, together with the duration and scope of such restrictions, are reasonable

Initial

limitations on Employee's employment and post-employment activities and that the restrictions are required to preserve, promote and protect the legitimate business interests of Company and impose no greater restraint than is reasonably necessary to secure such protection.

J.      Interpretation and Enforcement of Covenants.   To the extent that any provision of these covenants is found by a court of competent jurisdiction to be unreasonable in any respect, it is the intent of the parties that such court shall limit or modify the provision to make it reasonable in light of the circumstances in which it was made and specifically enforce the Agreement as limited. In the event that any provision of these covenants shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration or scope thereof, such invalidity or unenforceability shall attach only to the specific provision determined to be unenforceable and the covenants shall remain in full force and effect for the greatest time period and for the broadest scope permitted by applicable law.

## II.  GENERAL PROVISIONS

A.      Actions.

1.      Governing Law; Jurisdiction.   This Agreement shall be governed in all respects by the laws of the People's Republic of China. The parties agree to submit to the non-exclusive jurisdiction of the Courts of the People's Republic of China.   In the event legal action is taken as a result of any breach of this Agreement or to enforce the terms of this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

2.      Remedies.

(a)      Accounting for Profits.   Employee covenants and agrees that in the event Employee violates any of Employee's restrictions or obligations under this Agreement, Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations or other benefits which Employee directly or indirectly receives and/or may receive as a result of, growing out of or in connection with the violation of any restrictions or obligation created by this Agreement.   Employee and Company acknowledge and agree that such remedy shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Company is or may be entitled at law, in equity or under this Agreement.

      (b)    <u>Entitlement to Equitable Relief.</u>    Company and Employee acknowledge and agree that the breach by Employee of any restriction or obligation under this Agreement will cause Company substantial, immediate and irreparable harm, or that the extent of damages caused by any violation of this Agreement would be impossible to ascertain, and that there is no adequate remedy at law in the event of such breach.   Accordingly, Company and Employee hereby agree that Company shall be entitled to injunctive relief, without prejudice to any other right Company may have for actual monetary damages.   The remedies of Company for breach of this Agreement by the Employee shall be cumulative and Company may seek both injunctive relief and damages.

**B.**    **Entire Agreement.**   Except for any Inventors and Original Works Agreement and/or Confidentiality and Non-Solicitation Agreement, this Agreement sets forth the entire agreement and understanding between the parties respecting the matters within its scope and may be modified only in writing signed by Melaleuca and the Employee.   Any subsequent change in the Employee's duties, title, salary or compensation will not affect the validity or scope of this Agreement.   Nothing in this Agreement shall create a contract or agreement of employment between the Company and the Employee where a contract does not exist.   Nothing in this Agreement shall alter the terms of the Employment Contract between the Employer and Employee, where a contract does exist.

**C.**    **Waiver.**   Failure by the Company to insist upon strict compliance with any of the terms of this Agreement or failure of the Company to enforce any similar agreement against other employees, shall not be deemed to constitute a waiver of any such term, nor shall any waiver or relinquishment of, or failure by the Company to insist upon strict compliance with, any right or power hereunder at any time be deemed to constitute a waiver or relinquishment of such right or power at any other time or times.

**D.**    **Severability.**   In the event a court of competent jurisdiction determines that any provision of this Agreement is in violation of any statute, law, rule, regulation, ordinance or public policy, then the provisions of this Agreement that violate such statute, law, rule, regulation, ordinance or public policy shall be stricken or modified to the extent that such provision no longer violates such statute, law, rule, regulation, ordinance or public policy.   All provisions of this Agreement that do not violate any statute, law, rule, regulation, ordinance or public policy shall continue in full force and effect for all purposes.   Furthermore, any court order striking or modifying any provision of this Agreement shall modify or strike the provision in as limited a manner as possible



*China Key Employee Non-Interference and Non-Compete Agreement (v.0310)*
Page 8 of 9

<u>Initial</u>

to give as much effect as possible to the intentions of the parties to this Agreement.   This provision shall be construed and interpreted in a manner consistent with Sections I.I and I.J of this Agreement.

E.      **Legal Fees.**   In any action to interpret or enforce the terms of this Agreement, whether in law or in equity, the prevailing party shall be entitled to recover its reasonable attorneys' fees, expert witness fees, and out-of-pocket costs incurred in connection with such action in addition to any other relief it may be awarded.

F.      **Successors and Assigns.**   This Agreement will be binding upon the Employee's heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

        IN WITNESS WHEREOF, Company and Employee have executed this Agreement effective as of the date first set forth above.

Party A (Company Seal)                          Party B

_____                 _____
Legal Representative's or Authorized Representative's     Party B's Signature
Signature

| Date:                          | Date:  APR 21, 2011            |
|                                |                                |

骨干员工
禁止干涉和竞争协议

本协议由以下双方于 2011 年 4 月 13 日 (DD/MM/YY) 签订：

甲方     下文中，甲方简称"公司"或"用人单位"。

公司名称：   美乐家（中国）日用品有限公司

法人代表：   McKay Christensen

营业执照编号：  2600000220081229 0003

地址：    上海市闸北区共和新路1988号10栋15楼

电话：    86-21-3387 0222

传真：    86-21-3387 0822

乙方     下文中，乙方简称"员工"。

员工姓名：   葛南山

身份证号码：  K023229(7)

地址：    延平路10弄6号1602室

电话：    13917607629

  本《骨干员工禁止干涉和竞争协议》（下称"协议"）由员工与美乐家公司（根据美国爱达荷州法律成立的一家公司），以及美乐家公司的所有继任者、受让者、包括美乐家中国日用品有限公司在内的现有与原有国内及国际附属机构（统称"公司"）签订。（"附属机构"是指拥有、归属于美乐家公司或由美乐家公司共有的实体。）

<u>事实陈述</u>

  A.

  员工目前或将要受雇于美乐家中国日用品有限公司，职位为 市场花展副总

———————.

员工在此职位上提供的服务具有特殊性和独特性，并且员工在此过程中会全面接触公司的独立销售队伍和/或特殊培训、教育和经验。以后头衔和/或职责的变动应不影响本协议的适用性或可执行性。

《中国骨干员工禁止干涉和竞争协议》 (v.0310)
第1页，共9页               初稿

B.        员工在公司的职位还是一个信任和保密职位，因此员工可以接触保密、专有和其他信息，对向员工提供的这些信息只能以符合公司的最大权益和符合员工的忠实义务的方式进行使用。

C.

员工承认，他/她是一个"骨干员工"，并且由于公司的信任与投入，员工作为公司代表或发言人，已经和/或预计将获得高层内幕、影响、可信性、名声、名望、声誉和/或公共形象。员工明白，由于公司对员工的信任和投入，员工现在有和/或将会有危害公司合法商业权益的独特能力。

<u>协议</u>

为保护用人单位合法商业权益，用人单位在限制期内，应每月向员工提供按月支付禁止竞争补偿金，员工应自行承担禁止竞争补偿金的所有个人所得税。
如果合同终止或到期，用人单位有权选择是否要求员工在限制期内履行禁止竞争义务。如果用人单位选择不要求员工在限制期间履行禁止竞争义务，用人单位不支付上述禁止竞争经济补偿金。

I. <u>禁止干涉和竞争契约</u>

A.        <u>定义</u>。以下名词应采用下列定义。

1

<u>终止日期</u>。"终止日期"一词应指因为任何原因（无论自愿或非自愿）员工与公司的聘用关系终止的日期。如果员工与公司的聘用关系终止后，员工又再次受雇于公司，就任同样或任何其他职位，则"终止日期"一词应指员工与公司的聘用关系终止的最近的生效日期。

2

<u>限制期</u>。"限制期"一词应指从本协议生效之日起，到员工与公司的整个聘用期，以及终止日期之后的十八 (18) 个月的时间段。

3

<u>直接竞争</u>。"直接竞争"一词应视为包括受雇于公司、企业、合作方、实体或个人或参与其特定业务，而这些机构或个人从事任何适用法律、法规或机构或直销协会（Direct Selling Association）定义的直销或传销活动，生产、包装、销售、营销、分销或以其他方式让公众消费个人护理品、家

居护理品、化妆品、非处方药、食品或营养产品，包括但不限于安利、安达高、捷星、如新、康宝莱、Max International、嘉康利、自在生活、大溪地诺丽、优珍娜、赞臣、荔丽达、玫琳凯、爱家和雅芳。

本协议中，没有任何内容可以解释或理解为阻止员工以投资为目的，购买或持有任何公司3%以下发行在外股本。这类证券是在全国性证券交易所或场外交易市场上正常交易的一类权益证券。

4.

限制地区。"限制地区"一词应指中华人们共和国境内的省、市、县或其他已承认的地区、美国境内地区和在终止日期之前任何时间公司开展业务所在地的任何其他国家；但"限制地区"一词应不包括非由员工负责并且员工未提供服务或拥有明显代表权或影响力的地区。对于本定义而言，"明显代表权或影响力"包括但不限于以促销面且出现或对公司的独立销售队伍讲话，无论是在讲台上、在任何公共论坛上、打电话、通过视频报告、采用印刷或使用任何类似方式完成这些活动。

5. 业务联系人。

"业务联系人"一词应指顾问、供应商、卖方、客户、营销主管及公司的顾问、供应商与卖方的员工、代理和代表；为公司的顾问、供应商或卖方完成的任何项目或工作；公司正在尝试已经尝试从其获得项目、工作、物资、材料、服务或卖品的潜在顾问、供应商或卖方的任何有关信息或文档。

业务联系人应包业务联系人的身份或存在的有关信息或文档。

B.    禁止干涉或劝诱或分流业务。在员工受雇于公司期间和因任何原因终止与公司的聘用关系后两年    (2)
内，员工不得为了私利或为任何其他人或实体直接地间接联系、劝诱、建议、指导或引诱公司的任何客户或营销主管，以便实现或引起该客户或营销主管从与公司存在直接竞争关系的个人、公司、企业或实体购买、许可或以其他方式获得产品或服务，或充当其员工、代表、分销商或独立承包商。在同一时期内，员工亦不得直接或间接干涉公司与其任何客户、营销主管、交易商、分销商、供应商、卖方、独立承包商、服务提供商或与公司存在业务关系其他各方之间的业务关系，或引诱有关的任何一方终止其与公司的业务关系，或以不利于公司最大利益的方式修改这种关系的条款。

C.    禁止竞争。

i.

在限制期和限制地区内，除下文第C.ii.款规定的情况外，员工不得单独或与他人一道，以业主、股东、员工、主管、董事、合作伙伴、货方、投资者、顾问、委托人、代理、独立承包商、联合投资人或任何其他身份，直接或间接地推广、推荐或代官与公司存在直接竞争关系

的任何个人、公司、企业或实体（下称"竞争公司"）。这个方面的具体禁止事项如下：    1)
推广或代言竞争公司的报酬计划或产品；2)

向竞争公司中充当与公司的营销主管相同或类似职能的独立企业所有人或销售代表（下称竞争
公司"销售代表"）提供建议或与其交流，无论是在讲台上、在公共论坛中、在电话里、通过
视频报告、采用印刷或任何其他方式；3)

声称曾是公司员工。员工和员工将来加入的任何公司均不得公开声明员工与新公司的聘用或其
他关系，除非员工的新公司是上市公司，并且不超出向中国证券监督管理委员会或其他有关证
券交易所提交报告要求必须披露员工姓名的要求限度。新公司还必须向公司表示同意遵守本要
求；4)

有意地与公司的营销主管或重点客户联系或交谈。如果公司营销主管或重点客户与员工联系，
或员工认识到自己是在与公司营销主管或重点客户交谈，员工应告知此人，员工不得干涉奥乐
家的合同或关系，结束谈话，并立即向奥乐家法律部告知此次谈话；以及    5)

在与公司的任何诉讼或纠纷中，向任何人、公司、企业或实体（与此人、公司、企业或实体与
公司是否存在直接竞争关系无关）提供信息（除非按照有效法庭命令或相关行政命令而必须提
供的除外）、与其合作、协作或提供任何帮助。

ii.    仅当在限制地区内，员工与竞争公司的销售代表无接触，并且遵守上文第C.i.1)-5)

款指定的具体禁止事项，员工方可在限制期内，在限制地区内在竞争公司工作。对于与员工在
公司工作时所从事的工作或特定业务无关的工作或特定业务，本协议并不禁止员工获得这类工
作或从事这类特定业务。

**D.    禁止使用与公司的附属关系。**

在限制期内，员工不得因为任何业务联系人的直接或间接劝诱（见I A.5.款定义），使用或允许其他人或实体使
用他或她的姓名或曾在公司拥有的任何职位，为其他公司、个人或实体谋利。

**E.    忠实义务。** 员工同意，在受雇于公司期间，他/她将

(a) 不从事与公司直接竞争的任何咨询、聘用、业务或其他活动，(b)        恪尽职守履行他/她对公司的义务，(c)
为发展公司的业务投入适量的时间与精力，(d)        充当公司、公司业务、产品、管理团队和他员工的代表，(e)
遵守公司制订或颁发的所有规则、规定和通知，(f) 不直接或间接地管理、经营或参与任何业务活动而降低员工履
行公司义务的投入度和做出最大努力的能力，(g)        将不侵占公司的任何机会，(h)
每当有竞名公司或代表人联系员工，企图引诱或诱惑其为该公司工作时，立即告知公司。但是，员工可以购买和/

或持有以下权益     (i)     与公司不存在直接竞争关系的私有企业或公司的股份；(ii)     任何上市公司的股份；(iii) 共同基金；(iv) 风险投资基金；和 (v) 类似投资实体的股份。

F.

　　**禁止承担冲突性义务**。员工同意，在员工受雇于公司期间，员工将不从事与公司存在直接竞争关系的任何其他聘用、职业、咨询或其他业务活动，员工也不从事与员工在公司的义务和职责冲突的任何其他活动。

G.

　　**禁止贬损**。在限制期内，员工不得以任何方式，直接或间接向任何第三方传递关于公司、公司策略、理念、产品或人员的任何负面或毁谤性内容。如果员工违反本契约，除了本协议中所述的救济之外，员工还将有义务向公司归还公司支付的遣散费（如有），并应视为放弃并将不再有权获得公司所欠的其余遣散费。公司保留就造成的任何损失索赔的权利。

H.

　　**禁止支持竞争产品**。在限制期内，员工不得以任何方式，直接或间接支持与公司产品竞争的任何产品，推广或代育其产品与公司产品竞争的任何公司，或允许以任何形式使用员工的姓名或肖像来推广与公司产品竞争的任何公司或产品。

I.

　　**承认限制合理性**。员工承认，员工在公司的职位和工作活动对于公司不断取得经营上的成功至关重要。员工还承认，员工受雇于或参与任何具体的直接竞争活动将在公司的员工、客户和营销主管中产生该员工离开公司后找到了更好机会的印象，从而将使公司受到损害。员工特此承认并同意，本协议中对于员工活动的限制的性质，以及这种限制的持续时间和范围，是对员工受雇于公司期间和之后的活动的合理限制，保全、增加和保护公司的合法商业权益需要这种限制，并且这种限制所带来的约束力未超过实现这种保护所需的合理约束力。

J.

　　**契约的解释与执行**。各方同意，在有管辖权的法庭发现这些契约的任何规定在任何方面具有不合理性的，该法庭应限制或修改该规定，使其对于拟定该规定的情况具有合理性，并有限制地特别执行协议。如果有管辖权的法庭认为这些契约的任何规定因持续时间或范围而归于无效或不可执行，则仅被认定为不可执行的具体规定无效或不可执行，但契约在适用法律所允许的最长时间和最大范围内保持完全有效。

II. 一般规定
A.    诉讼。

1.
适用法律；管辖。本协议完全接受中华人民共和国法律的管辖。各方同意服从中国法院的非专属性管辖。在因违约或执行本协议条款而采取法律行动的情况下，胜诉方应有权获判合理的律师费和其他费用。

2.    救济。

(a)
收益核算。员工保证并同意，如果员工违反本协议中规定的任何员工限制或义务，对于员工因为违反本协议产生的任何限制或义务而直接获得或间接获得和/或可能获得的所有收益、补偿、佣金、报酬或其他利益，公司有权进行核算和获得偿还。员工和公司承认并同意，这种救济应作为公司依照法律、衡平法或本协议有权获得的任何禁制令救济或其他权利或救济之补充，并且不限于这一切。

(b)    衡平法救济权利。
公司和员工承认并同意，员工违反本协议的任何限制或义务为公司造成重大、直接和无可挽回的损害，或以任何形式违反本协议造成的损害将无法确定，并且在发生这种违约的行为的情况下，法律上没有充分的救济。因此，公司和员工特此同意，公司有权申请禁制令救济，而不减少公司可能拥有的任何其他实际损失损害赔偿金的权利。公司对于员工违反本协议的救济是可以追加的，并且公司可以同时寻求禁制令救济和违约金。

B.
完整协议。除《发明者与原创作品协议》和/或《保密和禁止劝诱员工协议》之外，本协议构成各方之间就标的达成的完整协议和谅解，并且须经奕乐家和员工以书面签署形式进行修改。以后员工义务、头衔、薪水或报酬的任何变动均不影响本协议的有效性或范围。在没有合同的情况下，本协议中的任何内容均不应构成公司与员工之间的劳动合同或协议。有合同的情况下，本协议中的任何内容均不应改变用人单位与员工之间的劳动合同。

C.
弃权。公司未坚持向其他员工主张严格遵守本协议的任何条款或强制执行任何类似协议均不应视为对任何该等条款的放弃，公司在任何时候弃权或放弃或未坚持主张严格遵守本协议中的任何权利或权力均不应视为构成在任何其他时间对该等权利或权力的弃权或放弃。

D.

　　　独立性。如果有管辖权的法院裁定本协议中的任何规定违反法令、法律、规则、规定、条例或公共政策，则应删除或修改本协议中违反这些法令、法律、规则、规定、条例或公共政策的规定，保持这些规定不违反这些法令、法律、规则、规定、条例或公共政策。本协议中没有违反任何法令、法律、规则、规定、条例或公共政策的所有规定应继续完全有效。此外，任何要求删除或修改本协议任何规定的法庭命令应以尽可能有限的方式作出，以使本协议各方尽可能多地达到目标效果。此规定应以与本协议第I.J款相一致的方式理解和解释。

E.

　　　诉讼费用。在无论是依照法律还是按照衡平法解释或执行本协议条款的任何诉讼中，胜诉方应在它可能获判的任何其他救济之外，有权获赔其由于采取这种行动而发生的合理律师费、专家证人费和付现费用。

F.

　　　继任者与受让人。本协议将对员工的继承者、执行者、管理者和其他法定代表具有约束力，并将维护公司、其继任者和其受让者的利益。

　　　本协议已由公司和员工于文首注明的日期签章，特此为证。

| 甲方（公章） | 乙方 葛临山 |
| | 乙方签字 |
| | 日期: APR 19, 2011 |

# EXHIBIT B

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

**THIS AGREEMENT IS SIGNED ON** 12/04/2011 **(DD/MM/YY) BY THE TWO PARTIES LISTED HEREUNDER:**

Party A                           Party A shall also be referred to below as the "Company" or "Employer".

Name of the Company:      Melaleuca (China) Wellness Products Co., Ltd.

Legal of Representative:   McKay Christensen

Business License No.:      26000002200812290003

Address:                        15F, No. 1988 Gonghexin Road, Shanghai

Tel:                              86-21-3387 0222
Fax:                             86-21-3387 0822


Party B                           Party B shall also be referred to below as the "Employee".

Name of the Employee:    Nelson Kot

ID Card No.:                   K023229(7)
Address:                        Room 1602 . NO.6 Alley10 . Yanping Road . China
Tel:                              139 17607629


    This Confidentiality and Non-Solicitation Agreement (the "Agreement") is made between the Employee and Melaleuca, Inc., a corporation incorporated under the laws of the state of Idaho in the United States, and all of Melaleuca, Inc.'s successors, assigns, current and former, local and international affiliates including Melaleuca (China) Wellness Products Co., Ltd. ("affiliates" defined to mean entities that own, are owned by, or are under common ownership with Melaleuca, Inc.) (collectively the "Company").

    In consideration and as a condition of the Employee's employment or continued employment with Melaleuca (China) Wellness Products Co., Ltd., and the wages or salary paid therefor, the Employee hereby agrees to the following:

    1.    **Confidential and Proprietary Information.**  The Employee acknowledges that he or she has had and/or will or may have access to or be exposed to certain confidential information about the Company and that the Employee will or may have access to or be exposed to "Confidential and Proprietary Information" (as that term is defined below) acquired or developed by the Company at the expense of the Company for use in its business or proposed business operations.

    2.    **Restrictions on Use of Confidential and Proprietary Information.**

        (a)    **Confidential and Proprietary Information Defined.**  For purposes of this Agreement, "Confidential and Proprietary Information" is to be construed broadly under the terms of this Agreement and means and includes, but is not necessarily limited to, the following:

*China Confidentiality and Non-Solicitation Agt (v0310)*
Page 1 of 5                                                                                      Initial

(i)   the identity or existence of the Company's employees, Marketing Executives, consultants, suppliers, vendors, and customers, accounts, dealers, independent contractors and service providers of the Company, or other parties with which the Company has business relationships and the employees, agents, and representatives of the same ("Business Contacts");

(ii)   any written, typed or printed list, document, electronic media or other materials identifying Business Contacts or potential Business Contacts;

(iii)   any financial or other information supplied to the Company by any Business Contact;

(iv)   any and all data or information involving the techniques, programs, systems, formulas, formulations, processes, products, plans, calculations, concepts, design sheets, design data, system design, computer programs, software, hardware, manuals, drawings, specifications, instructions, research, test procedures and results, equipment, pricing information,  or other concepts or ideas, involving or reasonably related to the business or prospective business  used or utilized by the Company in the conduct of its business or proposed business operations or used or utilized in connection with any of the Company's products or proposed products;

(v)   any information, list, document, manual, record, form or material used by the Company in the conduct of its business or proposed business operations, including, but not limited to, customer lists, supplier lists, Marketing Executive lists, employee lists, job functions, titles, standing and performance, compilations of sales volumes and Marketing Executive sales volumes or activity levels;

(vi)   any descriptive materials describing the systems, methods, formulas, formulations, processes or procedures employed by the Company in the conduct of its business or proposed business operations;

(vii)   any formulas or formulations for, or ingredients in, any of the Company's products or proposed products;

(viii)   any information or data regarding the effectiveness, safety, adverse effects, or popularity of any of the Company's products or proposed products or the ingredients of any of the Company's products or proposed products, whether produced by the Company, produced for the Company by any other company, corporation, partnership, entity or person or produced by the Company for any other company, corporation, partnership, entity or person;

(ix)   any information or data regarding the Company's financial affairs, including but not limited to sales volumes, income, expenses, profit margins, assets, liabilities and taxes;

(x)   any and all programs, processes, systems, methods and presentations, including but not limited to the Company's marketing plan, compensation structures, and recruiting and retention methods, whether or not developed or utilized by the Employee or the Company in the course of the Employee's  employment with the Company; and

(xi)   any other Trade Secret (as that term is defined in the Anti-competition Law and Several Provisions on Prohibiting Infringements upon Trade Secrets of People's Republic of China and incorporated herein by reference) or secret, proprietary or confidential information or

data concerning or related to the Company or the Company's business operations, financial condition or products or its proposed products or business operations.

The terms "list," "document," "data" or their equivalents, as used in this Section 1(a), are not limited to physical writings or compilations, but also include any and all information or data whatsoever, regardless of the form in which it is stored, regarding the subject matter of the "list," "document" or "data" whether or not such compilation has been reduced to writing.

(b)      Nondisclosure and Nonuse.   It is understood and agreed that, in the course of the Employee's employment with the Company and through his or her activities for and on behalf of the Company, the Employee has developed for the Company, received, dealt with or had access to or will develop for the Company, receive, deal with and have access to Confidential and Proprietary Information and that the Employee holds and will hold the Confidential and Proprietary Information in trust and confidence for the Company and for its benefit only.  The Employee agrees that he or she will not, during the time that the Employee is employed by the Company and for so long thereafter as the Company maintains confidential the Confidential and Proprietary Information or any of the Confidential and Proprietary Information, directly or indirectly, retain, make copies of, divulge, disclose or communicate to any entity or person, or utilize in any manner whatsoever any of the Confidential and Proprietary Information, except when necessary or required in the normal course of the Employee's employment with the Company and for the benefit of the Company or with the prior express written consent of the Company or as may be required by law.

(c)      Third Party Information.   The Employee recognizes that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use and utilize such information only for certain limited purposes.  The Employee agrees that he or she owes the Company and such third parties, during the term of the Employee's employment with the Company and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any entity or person (except as necessary in carrying out the Employee's activities, duties and responsibilities for and on behalf of the Company consistent with the Company's agreement with such third party) or to use any such confidential or propriety information for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with such third party) without the prior express written authorization of the Company.

(d)      Return of Proprietary Information.   Upon the request by the Company or the termination of the Employee's employment with the Company for any reason whatsoever, the Employee shall immediately turn over to the Company any and all Confidential and Proprietary Information then in the Employee's possession or under the Employee's control.  The Employee shall have no right to retain any copies of any document, instrument, list or material qualifying as Confidential and Proprietary Information for any reason whatsoever after the request by the Company for the return thereof or after the termination of his or her employment with the Company, without the express written consent of the Company.

(e)      Remedies.    Employee acknowledges the Confidential and Proprietary Information is of such character as to render it unique and that disclosure or use thereof in violation of this Agreement will result in irreparable damage to the Company.  If the Company brings an action to enforce any provision of this Agreement, the Employee will not defend in such action on the basis that the Company has an adequate remedy at law.  The remedies of the Company for breach of this Agreement by the Employee shall be cumulative and the Company shall have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. The Employee further agrees that no bond or other security shall be required in obtaining such equitable relief and the Employee hereby consents to the issuance of such injunction and to the ordering of specific performance.

(f)    **Exceptions.**    Notwithstanding the foregoing, the restrictions on nondisclosure do not apply to Confidential and Proprietary Information where Employee can establish by reliable and credible written documentation that: (a) the Confidential and Proprietary Information has become public through no action of the Employee; (b) the Confidential and Proprietary Information was disclosed or made public with prior written consent of the Company; (c) the Confidential and Proprietary Information was fully known by Employee prior to Employee's employment with the Company and has not become information in which the Company has an exclusive ownership or proprietary interest; or (d) the Confidential and Proprietary Information was received by Employee at any time from a source (other than the Company) lawfully having possession of such information and authorized to disclose such information.

3.    **Duty of Loyalty.**  Employee agrees that while employed by the Company he/she (a) will not engage in any consulting, employment, business or other activity that is competitive with the Company, (b) will devote his/her best efforts full time to the performance of his/her duties for the Company, (c) will give proper time and attention to furthering the Company's business, (d) will be an ambassador for the Company, its business, its products, its management team and its other employees, (e) will comply with all rules, regulations, and instruments established or issued by the Company, (f) will not, directly or indirectly, manage, operate or engage in any business which would detract from Employee's focus and ability to apply his/her best efforts to the performance of his/her duties for the Company, (g) will not usurp any corporate opportunities of the Company, and (h) will immediately notify the Company each time he/she is contacted by or on behalf of a competing company for the purpose of soliciting or enticing the Employee to work for such company. However, Employee may acquire and/or hold stock in a private business or company that is not competitive with the Company, the outstanding securities of any publicly traded company, and/or mutual funds, venture capital funds or similar investment entities.

4.    **Nonsolicitation of Employees.**  During the term of Employee's employment with the Company and for a period of two (2) years from the termination of Employee's employment with the Company for any reason whatsoever, Employee shall not directly or indirectly, either on his/her own account or for any person or entity (a) solicit, induce, or endeavor to cause any current or future employee of the Company to leave his/her employment with the Company; (b) recruit, hire or participate or be involved in any way in the recruiting or hiring of any current or future employee of the Company; or (c) induce or attempt to induce any current or future employee of the Company to breach his/her employment agreement with the Company.

5.    **Confidential Information of Others.**  Employee agrees that he/she will not disclose to the Company and/or use or induce the Company to use any proprietary, confidential or trade secret information of others, including, but not limited to, former employers. Employee represents and warrants that he/she has returned all property and confidential information belonging to all prior employers and has not brought any onto Company's premises.

6.    **General Provisions.**

(a)    **Governing Law; Jurisdiction.**  This Agreement shall be governed in all respects by the laws of the People's Republic of China, The parties agree to submit to the non-exclusive jurisdiction of the Courts of the People's Republic of China. In the event legal action is taken as a result of any breach of this Agreement or to enforce the terms of this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

(b)    **Entire Agreement; Not an Employment Contract.**  Except for any Inventors and Original Works Agreement and/or Key Employee Non-Interference and Non-Competition Agreement, this Agreement sets forth the entire agreement and understanding between the parties respecting the matters within its scope and may be modified only in writing signed by Melaleuca and the Employee. Any



*China Confidentiality and Non-Solicitation Agt (v0310)*
Page 4 of 5

_____
Initial

subsequent change in the Employee's duties, title, salary or compensation will not affect the validity or scope of this Agreement. Nothing in this Agreement shall create a contract or agreement of employment between the Company and the Employee where a contract does not exist. Nothing in this Agreement shall alter the terms of the Employment Contract between the Employer and Employee, where a contract does exist.

(c)   Waiver. Failure by the Company to insist upon strict compliance with any of the terms of this Agreement or failure of the Company to enforce any similar agreement against other employees, shall not be deemed to constitute a waiver of any such term, nor shall any waiver or relinquishment of, or failure by the Company to insist upon strict compliance with, any right or power hereunder at any time be deemed to constitute a waiver or relinquishment of such right or power at any other time or times.

(d)   Severability. In the event a court of competent jurisdiction determines that any provision of this Agreement is in violation of any statute, law, rule, regulation, ordinance or public policy, then the provisions of this Agreement that violate such statute, law, rule, regulation, ordinance or public policy shall be stricken or modified to the extent that such provision no longer violates such statute, law, rule, regulation, ordinance or public policy. All provisions of this Agreement that do not violate any statute, law, rule, regulation, ordinance or public policy shall continue in full force and effect for all purposes. Furthermore, any court order striking or modifying any provision of this Agreement shall modify or strike the provision in as limited a manner as possible to give as much effect as possible to the intentions of the parties to this Agreement.

(e)   Headings; Interpretation. The headings and captions used in this Agreement are for convenience only and shall not be considered in interpreting this Agreement. Notwithstanding any rule or maxim of construction to the contrary, any ambiguity or uncertainty in this Agreement shall not be construed against either of the parties hereto based upon authorship of any of the provisions hereof.

(f)   Successors and Assigns. This Agreement will be binding upon the Employee's heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

(g)   Conformance with Employee Handbook. The Employee agrees to act in conformance with the rules and regulations of the Company, some of which may be contained in the Company's Employee Handbook, if any.

| Party A (Company Seal) | Party B |
|---|---|
| _____<br>Legal Representative's or Authorized Representative's Signature<br><br>Date: | Party B's Signature<br><br>Date: APR 19, 2011 |



# 保密与禁止劝诱员工协议

本协议由以下双方于 __13/04/2011__ 年月日 (DD/MM/YY) 签订：

甲方            下文中，甲方简称"公司"或"用人单位"。

公司名称：         美乐家（中国）日用品有限公司

法人代表：         McKay Christensen

营业执照编号：     26000002200812290003

地址：                上海市闸北区共和新路1988号10栋15楼

电话：                86-21-3387 0222

传真：                86-21-3387 0822

乙方            下文中，乙方简称"员工"。

员工姓名：         蒋南山

身份证号码：       K 02322977

地址：                延平路10弄6号1602室

电话：                139 17607629

本《保密与禁止劝诱员工协议》（下称"协议"）由员工与美乐家公司（根据美国爱达荷州法律成立的一家公司），以及美乐家公司的所有继任者、受让者、包括美乐家中国日用品有限公司在内的现有与原有国内及国际附属机构（统称"公司"）签订。（"附属机构"是指拥有、归属于美乐家公司或由美乐家公司共有的实体。）

由于并作为员工受雇或继续受雇于美乐家中国日用品有限公司并因此而获得工资或薪水的条件，员工特此同意以下条款：

1.      保密与专有信息。员工承认他或她已经和/或将会或可能接触到公司的特定保密信息，并且员工将会或可能接触到公司为开展业务或提议的业务经营活动而自行付费取得或制作的"保密与专有信息"（定义见下文）。

2.      保密与专有信息的使用限制。

初稿

(a)　<u>保密与专有信息定义</u>。对于本协议的目的，"保密与专有信息"应按照本协议条款作广义的解释，其含义是并且包括但不一定限于以下各项：

(i)　公司员工、营销主管、顾问、供应商、卖方和公司的客户、交易商、独立承包商与服务提供商，或与公司有业务关系的其他各方及其员工、代理和代表（"业务联系人"）的身份或存在；

(ii)　带有业务联系人或潜在业务联系人身份信息的任何书面、录入或打印名单、文档、电子媒介或其他材料；

(iii)　任何业务联系人提供给公司的任何财务或其他信息；

(iv)　涉及技术、项目、系统、配方、配方设计、工艺、产品、计划、计算方法、概念、设计图纸、设计数据、系统设计、计算机程序、软件、硬件、手册、图纸、规格、说明、研究、测试步骤与结果、设备、价格信息的任何及所有数据或信息；或公司在开展经营活动或拟定经营活动中使用或利用、或与公司产品或拟定产品一起使用或利用的涉及或与其业务或潜在业务有合理联系的其他概念或想法；

(v)　公司用于开展经营活动或拟定经营活动的任何信息、名单、文档、手册、记录、表格或材料，包括但不限于客户名单、供应商名单、营销主管名单、员工名单、职务职能、头衔、状况与业绩、销售额和营销主管销售额或活动级别的汇编；

(vi)　公司在开展经营活动或拟定经营活动中所用的描述系统、方法、配方、配方设计、工艺或步骤的任何描述性材料；

(vii)　公司的任何产品或拟定产品的任何配方或配方设计或成份；

(viii)　关于公司的任何产品或拟定产品或公司的任何产品或拟定产品的成份的效力、安全性、不良效果或受欢迎程度的任何信息或数据，无论这些产品或拟定产品由公司生产，由其他公司、企业、合作方、实体或人员为公司生产，或由公司为任何其他公司、企业、合作方、实体或人员生产，均是如此；

(ix)　关于公司财务事务的任何信息或数据，包括但不限于销售额、收入、费用、利润率、资产、债务和税额；

(x)　任何及所有程序、工艺、系统、方法和演示文稿，包括但不限于公司的营销计划、报酬结构和招聘与留任方法，无论是否是在员工受雇于公司期间由员工或公司制作或利用，均是如此；和



(xi) 任何其他商业秘密（本协议参照适用《中华人民共和国反不当竞争法》和《中华人民共和国关于防止商业秘密侵权的若干规定》对此词的定义）或关于或涉及公司或公司业务活动、财务状况或产品及其拟定产品或经营活动的秘密、专有或保密信息或数据。

本协议第1(a)款所使用的"名单"、"文档"、"数据"等词或类似说法并非仅限于实体的书写或汇编形式，还包括任何及一切信息或数据，这与其存储形式无关，只要与"名单"、"文档"或"数据"这个主题有关，无论是否已将这些汇编信息整理成书面内容，均是如此。

　　　　(b)　　　**保密与不使用**。双方清楚并同意，在员工受雇于公司期间，并通过他或她为公司和代表公司所从事的活动，员工已经或将要为公司生成、接收、处理或接触保密与专有信息，并且员工现在和将来都将仅出于为公司获取其利益的目的而受托秘密拥有保密与专有信息。员工同意，他或她在受雇于公司期间，以及之后公司继续对保密与专有信息或任何保密与专有信息进行保密期间，将不直接或间接保留、复制、泄露、向任何实体或个人透露或传播或以任何方式利用任何保密与专有信息，除非在员工正常受雇于公司期间为公司利益而有必要或必须如此，或者获得公司的事先书面同意，或法律要求如此。

　　　　(c)　　　**第三方信息**。员工知道，公司已经并且将来还将从第三方接收保密或专有信息，公司有义务对这些信息保密，并且仅使用和利用这些信息来达到有限的目的。员工同意，在其受雇于公司期间和之后，他或她对于公司和这些第三方有义务以最保密的形式拥有所有这类保密与专有信息，并且未经公司事先明确书面授权，不向任何实体或个人透露这些信息（除非员工为公司和代表公司执行活动、义务和职责有必要如此，并且符合公司与该第三方的协议），或使用这类保密或专有信息，为公司或该第三方（按照公司与该第三方的协议）之外的任何其他方面获取利益。

　　　　(d)　　　**专有信息的返还**。应公司要求或出于无论什么原因员工与公司的雇佣关系终止，员工应立即向公司交回员工当时拥有或控制的任何和所有保密与专有信息。未经公司明确书面同意，在公司发出返回要求或员工与公司的雇佣关系终止后，他或她无权以任何理由保留属于保密与专有信息的任何文档、文书、名单或材料的副本。

　　　　(e)　　　**救济**。员工承认，保密和专有信息具有独特性，违反本协议而透露或使用这些信息将使公司遭受无法挽回的损失。如果公司采取行动，执行本协议的任何规定，员工不得以公司根据普通法拥有足够救济为由而抵制这种行动。公司对于员工违反本协议的救济是可以追加的，公司除可以获得的任何其他权利或救济之外，还应有权获得管辖法庭的禁止令，以制止这种违反行为或违反行为的威胁，并有权单独执行本协议的任何该等规定。员工还同意，为获取此等衡平法上的救济不需要契约或其他保证；员工特此同意这种禁止令和单独执行命令的发出。

　　　　(f)　　　**除外条款**。　　　虽有前述规定，保密限制不适用于员工通过下列可信、可靠的书面记录而生成的保密和专有信息：(a) 保密和专有信息非通过员工行为而以其他方式公开的；(b) 保密或专有信息在获得公司事先书面同意的情况下透露或公开的；(c) 员工在受雇于公司之前已经完全知晓保密与专有信息，并且这些信息并未为公司独有或独占的；(d) 员工从合法拥有保密和专有信息并获得透露该等信息授权的来源（非本公司）接收到的。

3.　　**忠实义务**。员工同意，在受雇于公司期间，他/她将 (a) 不从事与公司竞争的任何咨询、雇佣、业务或其他活动，(b) 恪尽职守履行他/她对公司的义务，(c) 为发展公司的业务投入适量的时间与精力，(d) 充当公司、公司业务、产品、管理团队和其他员工的代表，(e) 遵守公司制订或颁发的所有规则、规定和文书，(f) 不直接或间接地管理、经营或参与任何业务活动而降低员工履行公司义务的投入度和做出最大努力的能力，(g) 不侵占公司的任何机会，(h) 每当有竞争对手公司或代表人联系员工，企图引诱或诱惑其为该公司工作时，立即告知公司。但是，员工可以购买和/或持有与公司不存在竞争关系的私营企业或公司的股票、任何上市公司和/或共同基金、风险投资基金或类似投资实体已发行的证券。

4.　　**禁止劝诱员工**。员工受雇于公司期间和因故终止与公司的聘用关系后两年 (2) 年内，不得为了私利或为他人或其他实体 (a) 劝诱、引诱或努力让公司任何现有或未来员工从公司离职；(b) 招聘、聘用或参与或以任何方式卷入招聘或聘用公司的任何现有或未来员工的活动；(c) 或引诱或企图引诱公司的任何现有或未来员工，违反他/她与公司的劳动协议。

5.　　**其他保密信息**。员工同意，他/她将不向公司透露和/或使用或引诱公司使用包括但不限于原用人单位在内的任何专有、保密或商业秘密信息。员工表示并保证，他/她已返还属于所有前用人单位的所有财产和保密信息，并且未将所有这些财产和保密信息携带至公司所在地。

6.　　**一般规定**。

　　　　(a)　　**适用法律；管辖**。本协议完全接受中华人民共和国法律的管辖。各方同意服从中国法院的非专属性管辖。在因违约或执行本协议条款而采取法律行动的情况下，胜诉方有权获判合理的律师费和其他费用。

　　　　(b)　　**完整协议；非劳动合同**。除《发明者与原创作品协议》和/或《骨干员工不干涉和不竞争协议》之外，本协议构成各方之间就本标的达成的完整协议和谅解，并且仅得经美乐家和员工以书面签署的形式进行修改。以后员工义务、头衔、薪水或报酬出现任何变动均不影响本协议的有效性或范围。没有合同的情况下，本协议中的任何内容均不构成公司与员工之间的劳动合同或协议。有合同的情况下，本协议中的任何内容均不应改变用人单位与员工之间的劳动合同。

　　　　(c)　　**弃权**。公司未坚持向其他员工主张严格遵守本协议的任何条款或强制执行任何类似协议均不应视为对任何该等条款的放弃，公司在任何时候弃权或放弃或未坚持主张严格遵守本协议中的任何权利或权力均不应视为在任何其他时间对该等权利或权力的弃权或放弃。

　　　　(d)　　**独立性**。如果有管辖权的法院裁定本协议中的任何规定违反法令、法律、规则、规定、条例或公共政策，则应删除或修改本协议中违反这些法令、法律、规则、规定、条例或公共政策的规定，保持这些规定不违反这些法令、法律、规则、规定、条例或公共政策。本协议中没有违反任何法令、法律、规则、规定、条例或公共政策的所有规定应继续完全有效。此外，任何要求删除或修改本协议任何规定的法庭命令应以尽可能有限的方式作出，以使本协议各方尽可能多地达到目标效果。



(e)　**标题；解释**。本协议中使用的标题和说明只是为了便于阅读，不应视为对本协议的解释。本协议有模糊或不确定之处，不应因一方起草而作出对本协议的一方不利的解释，尽管任何解释规则或原则可能作出相反的解释。

(f)　**继任者与受让人**。本协议将对员工的继承者、执行者、管理者和其他法定代表具有约束力，并将维护公司、其继任者和其受让者的利益。

(g)　**遵守员工手册**。员工同意遵守公司的规则和规定，某些规则和规定可能包含于公司员工手册中（如有）。

| 甲方（公章） | 乙方 |
|---|---|
| ——————————— | 葛南山 |
| 法人代表或授权代表签字 | 乙方签字 |
| 日期： | 日期：APR 19, 2011 |



初稿

# EXHIBIT C

## MELALEUCA, INC.

## KEY EMPLOYEE
## NON-INTERFERENCE AND NON-COMPETITION AGREEMENT

NAME OF EMPLOYEE: _KOT NAM SHAN_ (the "Employee").

DATE: _APR 26_, _2010_

### RECITALS

A.    Employee is currently, or will be, employed by Melaleuca, Inc. ("Company") in the position of _DIRECTOR OF SALES_. The services performed by Employee for Company in this position are special and unique and involve a high degree of exposure to the Company's independent sales force, and/or of specialized training, education and experience. Employee may be employed in other positions in the future that also involve specialized training and experience. Generally, the Employee's position with the Company will include, but not be limited to, the following:

_____

_____

Subsequent title and or responsibility changes shall not affect the applicability or enforceability of this Agreement.

B.    Employee's position with Company is also a position of trust and confidence which allows Employee access to confidential, proprietary and other information. Such information is provided to Employee solely for use in a manner consistent with the best interests of Company and consistent with Employee's duty of loyalty.

C.    Employee acknowledges that he/she is a "key employee" as that term is defined by Idaho Code § 44-2702(1) and, as a result of the Company's trust and investment, Employee has and/or is expected to gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation and/or public persona as a representative or spokesperson of the Company. Employee understands that because of the Company's trust and investment in Employee, Employee has and/or will have a unique ability to harm the Company's legitimate business interests.

D.    For the purpose of protecting Company's legitimate business interests, and in consideration of Employee's employment or continued employment with Company, Employee and Company desire to enter into this Agreement.

### AGREEMENT

In consideration of the foregoing, the mutual promises herein contained, and in consideration of Employee's employment or continued employment with Company and any compensation now or hereafter paid therefor, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

### I. NON-INTERFERENCE AND NON-COMPETITION COVENANTS

A.    **Definitions.** The following terms shall be defined as provided below.

Initial

## Exhibit A

Exhibit A

1. <u>Termination Date</u>. The phrase "Termination Date" means the effective date of Employee's termination from employment with Company for any reason, whether voluntary or involuntary. In the event Employee's employment with Company is terminated and Employee is subsequently rehired by Company in the same or any other position, the phrase "Termination Date" shall refer to the most recent effective date of Employee's termination from employment with Company.

2. <u>Period of Restriction</u>. The phrase "Period of Restriction" shall mean the period commencing on the effective date of this Agreement and continuing during the term of Employee's employment with Company and for a period of **twelve (12) months** after the Termination Date.

3. <u>Direct Competition</u>. The phrase "Direct Competition" shall be deemed to include engaging in employment or a line of business with a company, corporation, partnership, entity or person that is engaged in direct selling or multi-level marketing as defined by any applicable law, regulation or agency or by the Direct Selling Association, that produces, packages, sells, markets, distributes or otherwise makes available for public consumption, personal care, home care, cosmetic, over-the-counter pharmaceuticals, foods or nutritional products, including, but not limited to, companies such as Amway, Alticor, Quixtar, NuSkin, Herbalife, Max International, Shaklee, FreeLife, Tahitian Noni, USANA, Xango, Morinda, Mary Kay, Agel and Avon. Nothing in this Agreement shall be interpreted or construed to prevent Employee from purchasing or holding for investment less than 3% of the outstanding capital stock of any corporation with a class of equity securities which are regularly traded either on a national securities exchange or in the over-the-counter market.

4. <u>Restricted Area</u>. The phrase "Restricted Area" shall mean any state, county, city or other recognized geographic area within the United States, any territory of the United States and any foreign country in which Company is conducting business at any time prior to the Termination Date; provided that the phrase "Restricted Area" shall not include geographic areas over which the Employee had no responsibility and in which the Employee did not provide services or have a significant presence or influence. For purposes of this definition, the phrase "significant presence or influence" includes but is not limited to making promotional appearances or speaking to the Company's independent sales force, whether on stage, in any public forum, in phone calls, via video presentations, in print, or in any similar manner.

5. <u>Business Contacts</u>. The phrase "Business Contacts" shall mean consultants, suppliers, vendors, customers, and Marketing Executives, and the employees, agents and representatives of Company's consultants, suppliers and vendors, any projects or work performed for Company's consultants, suppliers or vendors, and any information or documents concerning potential consultants, suppliers or vendors of Company from whom Company is attempting or has attempted to obtain projects, work, supplies, materials, services or sales. Business Contacts shall include information and documents regarding the identity or existence of Business Contacts.

B. <u>Non-Interference or Solicitation or Diversion of Business</u>. During the Period of Restriction, Employee shall not, directly or indirectly, contact, solicit, advise or consult any customer or Marketing Executive of Company for the purpose or with the effect of causing such customer or Marketing Executive to purchase, license or otherwise obtain products or services from, or act as an employee, representative, distributor or independent contractor for, a person, firm, business or entity in Direct Competition with the Company. Similarly, during the Period of Restriction, Employee shall not directly or indirectly interfere with the business relationship between Company and any of its customers, Marketing Executives, accounts, dealers, distributors, suppliers, vendors, independent contractors, service providers, or other parties with which Company has business relationships, or induce any such party to terminate its relationship with Company, or to modify the terms of such relationship in a manner adverse to the best interests of Company.

C. <u>Non-Competition</u>.

i.   During the Period of Restriction and in the Restricted Area, except as specified in Subsection C.ii. below, Employee shall not, alone or in association with others, as owner, shareholder, employee, officer, director, partner, lender, investor, consultant, principal, agent, independent contractor, co-venturer, or in any other capacity, directly or indirectly promote or speak for or

Exhibit A

Exhibit A

on behalf of any person, firm, business, or entity in Direct Competition with the Company ("Competing Company"). This prohibition specifically includes the following: 1) promoting or speaking on behalf of the compensation plan or products of a Competing Company; 2) advising or speaking to the Competing Company's independent business owners or sales representatives who serve the same or similar function as Company's Marketing Executives (Competing Company's "Sales Representatives"), whether on stage, in any public forum, in phone calls, via video presentations, in print, or in any other manner; 3) holding himself out as formerly employed by Company. Neither Employee nor any company with which Employee becomes affiliated will make any public announcements about Employee's employment or other association with the new company, except if Employee's new company is publicly traded and to the extent it is required to file reports with the SEC that must disclose Employee's name. The new company must also agree with Company to abide by this requirement; 4) knowingly contacting or speaking with Company's Marketing Executives or Preferred Customers. If Employee is contacted by a Company Marketing Executive or Preferred Customer, or if Employee becomes aware that he is speaking with a Company Marketing Executive or Preferred Customer, Employee shall advise that person that Employee cannot interfere with any of Melaleuca's contracts or relationships, end the conversation and immediately notify Melaleuca's legal department of the conversation; and 5) providing information to (except pursuant to a valid court order), cooperate with, collaborate with, or assist in any way, any person, firm, business or entity (whether such person, firm, business or entity is in Direct Competition with the Company or not) in connection with any litigation or dispute with Company.

ii.     Employee may work for a Competing Company during the Period of Restriction and in the Restricted Area only if Employee has no contact with the Competing Company's Sales Representatives in the Restricted Area and abides by the specific prohibitions identified in Subsection C.I.1)-5) above. This Agreement is not intended to prohibit Employee from obtaining employment or working in a line of business unrelated to the type of employment or line of business conducted by the Employee while working for the Company.

**D.     Non-Use of Company Affiliation.** During the Period of Restriction, Employee shall not use or allow to be used by any other person or entity his or her name, or any positions he or she has ever had with Company, in connection with the direct or indirect solicitation of any Business Contact, as defined in Section I.A.5., for such other company, person or entity.

**E.     Duty of Loyalty.** Employee agrees that while employed by Company he/she (a) will not engage in any consulting, employment, business or other activity that is in Direct Competition with the Company, (b) will devote his/her best efforts full time to the performance of his/her duties for Company, (c) will give proper time and attention to furthering Company's business, (d) will be an ambassador for the Company, its business, its products, its management team and its other employees, (e) will comply with all rules, regulations, and instructions established or issued by Company, (f) will not, directly or indirectly, manage, operate or engage in any business which would detract from Employee's focus and ability to apply his/her best efforts to the performance of his/her duties for Company, (g) will not usurp any corporate opportunities of Company, and (h) will immediately notify the Company each time Employee is contacted by or on behalf of a Competing Company for the purpose of soliciting or enticing Employee to work for such Competing Company. However, Employee may acquire and/or hold interests in (h) a private business or company that is not in Direct Competition with the Company; (ii) any publicly traded company; (iii) mutual fund; (iv) venture capital fund; and (v) similar investment entities.

**F.     No Conflicting Obligations.** Employee agrees that, during the term of Employee's employment with Company, Employee will not engage in any other employment, occupation, consulting or other business activity in Direct Competition with the Company, nor will Employee engage in any other activities that conflict with Employee's obligations and duties to Company.

Exhibit A

Exhibit A

G.    **Non-Disparagement**.  During the Period of Restriction, Employee shall not in any way communicate to any third party, either directly or indirectly, anything negative or disparaging about Company, its policies, philosophies, products or personnel.  If Employee violates this covenant, in addition to the remedies set forth in the Agreement, Employee will be obligated to repay to Company severance payments paid by Company, if any, and shall be deemed to waive and will not be entitled to receive any further severance payments owing by Company.

H.    **Non-Endorsement**.   During the Period of Restriction, Employee shall not in any way, directly or indirectly, endorse any product that competes with products of Company, promote or speak on behalf of any company whose products compete with those of Company, or allow Employee's name or likeness to be used in any way to promote any company or product that competes with products of Company.

I.    **Acknowledgment of Reasonableness of Restrictions**.  Employee acknowledges that Employee's position and work activities with the Company are crucial to the ongoing success of Company's operations. Employee acknowledges further that Employee's employment or involvement with any Direct Competition in particular would create the impression in the minds of Company's employees, customers, and Marketing Executives that Employee has left Company for a better opportunity, which impression would damage Company.  Employee specifically acknowledges and agrees that the nature of the limitations upon Employee's activities as specified herein, together with the duration and scope of such restrictions, are reasonable limitations on Employee's employment and post-employment activities and that the restrictions are required to preserve, promote and protect the legitimate business interests of Company and impose no greater restraint than is reasonably necessary to secure such protection.

J.    **Interpretation and Enforcement of Covenants**.  To the extent that any provision of these covenants is found by a court of competent jurisdiction to be unreasonable in any respect, it is the intent of the parties that such court shall limit or modify the provision to make it reasonable in light of the circumstances in which it was made and specifically enforce the Agreement as limited. In the event that any provision of these covenants shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration or scope thereof, such invalidity or unenforceability shall attach only to the specific provision determined to be unenforceable and the covenants shall remain in full force and effect for the greatest time period and for the broadest scope permitted by applicable law.  Employee and Company intend that these covenants shall be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America and one for each and every political subdivision of each and every other country where the covenants are effective.

II. **GENERAL PROVISIONS**
A.    Actions.

    1.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Idaho applicable to contracts entered into and to be performed entirely within such State.

    2.    **Exclusive Jurisdiction and Venue**.  Subject to any applicable agreement regarding arbitration, if any, Company and Employee agree to the exclusive jurisdiction of (and consent to the personal jurisdiction of and to venue in) the courts of the Seventh Judicial District Court of the State of Idaho or of the United States District Court for the District of Idaho for any action arising out of or in any way related to the interpretation and enforcement of this Agreement.

    3.    Remedies.

        (a)    **Accounting for Profits**.  Employee covenants and agrees that in the event Employee violates any of Employee's restrictions or obligations under this Agreement, Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations or other benefits which Employee directly or indirectly receives and/or may receive as a result of, growing out of or in connection with the violation of any restrictions or obligation created by this Agreement.  Employee and Company acknowledge

Exhibit A

Exhibit A

and agree that such remedy shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Company is or may be entitled at law, in equity or under this Agreement.

      (b)     <u>Entitlement to Equitable Relief</u>.   Company and Employee acknowledge and agree that the breach by Employee of any restriction or obligation under this Agreement will cause Company substantial, immediate and irreparable harm, or that the extent of damages caused by any violation of this Agreement would be impossible to ascertain, and that there is no adequate remedy at law in the event of such breach. Accordingly, Company and Employee hereby agree that Company shall be entitled to injunctive relief, without prejudice to any other right Company may have in law or equity, by bringing an appropriate action for such remedy in any court of competent jurisdiction which Company, in its sole discretion, deems appropriate. If Company brings an action to enforce any provision of this Agreement, the Employee shall not defend such action on the basis that the Company has an adequate remedy at law. The remedies of Company for breach of this Agreement by the Employee shall be cumulative and Company may seek both injunctive relief and damages.

**B.**    **Entire Agreement.**  Except as otherwise specifically provided herein, and as provided in any Inventions and Original Works Agreement and/or any Confidentiality and Non-Solicitation Agreement between the parties, this Agreement sets forth the entire agreement and understanding between Company and Employee relating to the subject matter hereof and supersedes all prior understandings and agreements with respect to the subject matter covered by this Agreement. No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement, will be effective unless in a writing signed by both parties. Any subsequent change or changes in Employee's duties, salary or compensation will not affect the validity or scope of this Agreement.

**C.**    **Non-Waiver.**  No failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by either party under this Agreement shall constitute a waiver thereof or shall preclude any other or further exercise of the same or any other right, power or remedy.

**D.**    **Severability.**  If one or more of the provisions of this Agreement are deemed void by law, then the remaining provisions shall continue in full force and effect. This provision shall be construed and interpreted in a manner consistent with Sections I.I and I.J of this Agreement.

**E.**    **No Modification of At-Will Employment.**  Nothing in this Agreement shall be construed to give to Employee any right to employment for any specific period of time or to limit or restrict Employee's right to terminate Employment with Company, or to otherwise alter or modify the at-will nature of Employee's employment with Company.

**F.**    **Legal Fees.**  In any action to interpret or enforce the terms of this Agreement, whether in law or in equity, the prevailing party shall be entitled to recover its reasonable attorneys' fees, expert witness fees, and out-of-pocket costs incurred in connection with such action in addition to any other relief it may be awarded.

**G.**    **Successors and Assigns.**  Employee acknowledges and agrees that this Agreement shall inure to the benefit of Company and any of its successors and assigns.

     IN WITNESS WHEREOF, Company and Employee have executed this Agreement effective as of the date first set forth above.

EMPLOYEE:

Signature: _____*Nelson*_____

Printed Name: _____KOT NAM SHAN_____

Key%20Employee%20Non-Interference%20and%20Non-Compete%20%28v1209%29%5B2%5D

Initial

# Exhibit A

# EXHIBIT D

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

NAME OF EMPLOYEE: _KOT NAM SHAN_____ (the "Employee")

In consideration and as a condition of the Employee's employment or continued employment with Melaleuca, Inc. (the "Company") and the wage or salary paid therefor by the Company, the Employee hereby agrees to the following:

1.    **Confidential and Proprietary Information**.  The Employee acknowledges that he or she has had and/or will or may have access to or be exposed to certain confidential information about the Company and that the Employee will or may have access to or be exposed to "Confidential and Proprietary Information" (as that term is defined below) acquired or developed by the Company at the expense of the Company for use in its business or proposed business operations.

2.    **Restrictions on Use of Confidential and Proprietary Information**.

(a)    **Confidential and Proprietary Information Defined**.  For purposes of this Confidentiality and Non-Solicitation Agreement (the "Agreement"), "Confidential and Proprietary Information" is to be construed broadly under the terms of this Agreement and means and includes, but is not necessarily limited to, the following:

(i)  the identity or existence of Company's vendors, consultants and suppliers ("Business Contacts");

(ii)  any written, typed or printed list, document, electronic media or other materials identifying Business Contacts or potential Business Contacts;

(iii)  any financial or other information supplied to the Company by any Business Contact;

(iv)  any and all data or information involving the techniques, programs, systems, formulas, formulations, processes, products, plans, calculations, concepts, design sheets, design data, system design, computer programs, software, hardware, manuals, drawings, specifications, instructions, research, test procedures and results, equipment, pricing information,  or other concepts or ideas, involving or reasonably related to the business or prospective business  used or utilized by the Company in the conduct of its business or proposed business operations or used or utilized in connection with any of the Company's products or proposed products;

(v)  any list, document, manual, record, form or material used by the Company in the conduct of its business or proposed business operations, including, but not limited to, customer lists, supplier lists, Marketing Executive lists, compilations of sales volumes and Marketing Executive sales volumes or activity levels;

(vi)  any descriptive materials describing the systems, methods, formulas, formulations, processes or procedures employed by the Company in the conduct of its business or proposed business operations;

(vii)  any formulas or formulations for, or ingredients in, any of the Company's products or proposed products;

(viii)  any information or data regarding the effectiveness, adverse effects,  or popularity of any of the Company's products or proposed products or the ingredients of any of the Company's products or proposed products, whether produced by the Company, produced for the Company by any other company, corporation, partnership, entity or person or produced by the Company for any other company, corporation, partnership, entity or person;

(ix)  any information or data regarding the Company's financial affairs, including but not limited to sales volumes, income, expenses, profit margins, assets, liabilities and taxes;

(x)  any and all programs, processes, systems, methods and presentations, including but not limited to the Company's marketing plan, compensation structures, and

Exhibit B

recruiting and retention methods, whether or not developed or utilized by the Employee or the Company in the course of the Employee's employment with the Company; and

(xi) any other Trade Secret (as that term is defined in the Idaho Trade Secrets Act, Idaho Code " 48-801 et seq. and incorporated herein by reference) or secret, proprietary or confidential information or data concerning or related to the Company or the Company's business operations, financial condition or products or its proposed products or business operations.

The terms "list," "document," "data" or their equivalents, as used in this Section 1(a), are not limited to physical writings or compilations, but also include any and all information or data whatsoever, regardless of the form in which it is stored, regarding the subject matter of the "list," "document" or "data" whether or not such compilation has been reduced to writing.

(b)     **Nondisclosure and Nonuse**.  It is understood and agreed that, in the course of the Employee's employment with the Company and through his or her activities for and on behalf of the Company, the Employee has developed for the Company, received, dealt with or had access to or will develop for the Company, receive, deal with and have access to Confidential and Proprietary Information and that the Employee holds and will hold the Confidential and Proprietary Information in trust and confidence for the Company and for its benefit only.  The Employee agrees that he or she will not, during the time that the Employee is employed by the Company and for so long thereafter as the Company maintains confidential the Confidential and Proprietary Information or any of the Confidential and Proprietary Information, directly or indirectly, retain, make copies of, divulge, disclose or communicate to any entity or person, or utilize in any manner whatsoever any of the Confidential and Proprietary Information, except when necessary or required in the normal course of the Employee's employment with the Company and for the benefit of the Company or with the prior express written consent of the Company.

(c)     **Third Party Information**.  The Employee recognizes that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use and utilize such information only for certain limited purposes.  The Employee agrees that he or she owes the Company and such third parties, during the term of the Employee's employment with the Company and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any entity or person (except as necessary in carrying out the Employee's activities, duties and responsibilities for and on behalf of the Company consistent with the Company's agreement with such third party) or to use any such confidential or propriety information for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with such third party) without the prior express written authorization of the Company.

(d)     **Return of Proprietary Information**.  Upon the request by the Company or the termination of the Employee's employment with the Company for any reason whatsoever, the Employee shall immediately turn over to the Company any and all Confidential and Proprietary Information then in the Employee's possession or under the Employee's control.  The Employee shall have no right to retain any copies of any document, instrument, list or material qualifying as Confidential and Proprietary Information for any reason whatsoever after the request by the Company for the return thereof or after the termination of his or her employment with the Company, without the express written consent of the Company.

(e)     **Remedies**.  The Employee acknowledges that the Confidential and Proprietary Information is of such character as to render it unique and that disclosure or use thereof in violation of this Agreement may result in irreparable damages to the Company.  Because of the difficulty of estimating with exactness the damages that will result, the Company and the Employee agree that liquidated damages in the following amounts are not penalties, but constitute a reasonable forecast of the probable loss that the Company would incur if the Employee breaches this Agreement:  (i) $2,500 per Business Contact for the disclosure or misuse of information regarding Business Contacts, (ii) $50,000 per occurrence for the disclosure or misuse of financial or computer-related information or product formulas or

Exhibit B

formulations, and (iii) $10,000 per occurrence for all other violations of this Agreement. Liquidated damages shall be payable by Employee for violations of this Agreement in accordance with the foregoing; provided, that Company has the right to claim and receive a higher amount of compensatory damages if the Company can show that the actual damages sustained will exceed the amounts set forth herein. The remedies of the Company for breach of this Agreement by the Employee shall be cumulative and the Company may seek both injunctive relief and damages.

(f)     **Exceptions**.    Notwithstanding the foregoing, the restrictions on nondisclosure do not apply to Confidential Information where Employee can establish by reliable and credible written documentation that: (a) the Confidential Information has become public through no action of the Employee; (b) the Confidential Information was disclosed or made public with prior written consent of the Company; (c) the Confidential Information was fully known by Employee prior to Employee's employment with the Company and has not become information in which the Company has an exclusive ownership or proprietary interest; or (d) the Confidential Information was received by Employee at any time from a source (other than the Company) lawfully having possession of such information and authorized to disclose such information.

3.     **Duty of Loyalty.**  Employee agrees that while employed by the Company he/she (a)  will not engage in any consulting, employment, business or other activity that is competitive with the Company, (b) will devote his/her best efforts full time to the performance of his/her duties for the Company, (c) will give proper time and attention to furthering the Company's business, (d) will comply with all rules, regulations, and instruments established or issued by the Company,  (e) will not, directly or indirectly, manage, operate or engage in any business which would detract from Employee's focus and ability to apply his/her best efforts to the performance of his/her duties for the Company, and (f) will not usurp any corporate opportunities of the Company.  However, Employee may acquire and/or hold stock in a private business or company that is not competitive with the Company, the outstanding securities of any publicly traded company, and/or mutual funds, venture capital funds or similar investment entities.

4.     **Nonsolicitation of Employees**.  During the term of Employee's employment with the Company and for a period of two (2) years from the termination of Employee's employment with the Company for any reason whatsoever, Employee shall not directly or indirectly, either on his/her own account or for any person or entity (a) solicit, induce, or endeavor to cause any current or future employee of the Company to leave his/her employment with the Company; (b) recruit, hire or participate or be involved in any way in the recruiting or hiring of any current or future employee of the Company; or (c) induce or attempt to induce any current or future employee of the Company to breach his/her employment agreement with the Company.

5.     **Confidential Information of Others**.  Employee agrees that he/she will not disclose to the Company and/or use or induce the Company to use any proprietary, confidential or trade secret information of others, including, but not limited to, former employers. Employee represents and warrants that he/she has returned all property and confidential information belonging to all prior employers and has not brought any onto Company's premises.

6.     **General Provisions**.

(a)     **Governing Law; Jurisdiction.**  This Agreement shall be governed in all respects by the laws of the State of Idaho, and no action involving this Agreement may be brought except in the Seventh Judicial District Court of the State of Idaho or in the United States District Court for the District of Idaho.

(b)     **Entire Agreement; Not an Employment Contract.**  Except for any Inventors and Original Works Agreement and/or Key Employee Non-Interference and Non-Competition Agreement, this Agreement sets forth the entire agreement and understanding between the parties respecting the matters within its scope and may be modified only in writing signed by Melaleuca and the Employee. Any subsequent change in the Employee's duties, title, salary or compensation will not affect the validity or scope of this Agreement.  Nothing in this Agreement shall create a contract or agreement of employment

*Long Form Confidentiality and Non-Solicitation Agt - (v2-0408).doc*
**Page 3 of 4**

Exhibit B

between the Company and the Employee. Unless the Company and the Employee have entered into a separate written and signed employment contract or agreement, the Employee understands and acknowledges that his or her employment with the Company is for an unspecified duration and constitutes at-will employment, and that this employment relationship may be terminated at any time, with or without cause, at the option of the Company or the Employee, with or without prior notice.

(c)     <u>Waiver</u>. Failure by the Company to insist upon strict compliance with any of the terms of this Agreement or failure of the Company to enforce any similar agreement against other employees, shall not be deemed to constitute a waiver of any such term, nor shall any waiver or relinquishment of, or failure by the Company to insist upon strict compliance with, any right or power hereunder at any time be deemed to constitute a waiver or relinquishment of such right or power at any other time or times.

(d)     <u>Severability</u>. In the event a court of competent jurisdiction determines that any provision of this Agreement is in violation of any statute, law, rule, regulation, ordinance or public policy, then the provisions of this Agreement that violate such statute, law, rule, regulation, ordinance or public policy shall be stricken or modified to the extent that such provision no longer violates such statute, law, rule, regulation, ordinance or public policy.  All provisions of this Agreement that do not violate any statute, law, rule, regulation, ordinance or public policy shall continue in full force and effect for all purposes.  Furthermore, any court order striking or modifying any provision of this Agreement shall modify or strike the provision in as limited a manner as possible to give as much effect as possible to the intentions of the parties to this Agreement.

**EMPLOYEE:**

_____     Date: _APR 26th_____, 20_10_
(Signature)

_Kot  Nam  Shan_____
(Print Name)

Home Address:
_FLAT 8A  YEE SHAN NANSION_
_QUARRY BAY  TAIKOOSHING, HK_

Exhibit B

# EXHIBIT E

1/22/2018 国家企业信用信息公示系统

首页 | 企业图形展示 | 信息公告 | 信用帮助 | 导航 | 登录 注册

企业信用信息 | 经营异常名录 | 严重违法失信企业名单

请输入企业名称、统一社会信用代码或注册号

## 美乐家（中国）日用品有限公司 （存续（在营、开业、在册））

统一社会信用代码： 913100007514586612
法定代表人： THOMAS KENDALL KNUTSON
登记机关： 上海市工商行政管理局
成立日期： 2003年06月19日

岁证投诉
信息分享
信息打印

基础信息 | 行政许可信息 | 行政处罚信息 | 列入经营异常名录信息 | 列入严重违法失信企业名单（黑名单）信息

### 营业执照信息

- 统一社会信用代码： 913100007514586612
- 类型： 有限责任公司(外国法人独资)
- 注册资本： 1201.000000万美元
- 营业期限自： 2003年06月19日
- 登记机关： 上海市工商行政管理局
- 登记状态： 存续（在营、开业、在册）
- 企业名称： 美乐家（中国）日用品有限公司
- 法定代表人： THOMAS KENDALL KNUTSON
- 成立日期： 2003年06月19日
- 营业期限至： 2033年06月18日
- 核准日期： 2003年06月19日

- 住所： 上海市奉贤区奉浦远东北路1515号龙洋工业园区16号厂房
- 经营范围： 开发、生产清洁洗涤产品、餐具洗涤剂、个人清洁产品、化妆品、日用品，销售自产产品及提供产品使用、特性介绍的咨询服务；与自产产品同类的商品、卫生用品、宠物用品、文具、电器、锅具、纺织品、配饰、箱包、保健食品（限分支机构经营）、预包装食品、宠物食品的进出口、批发、零售、佣金代理（拍卖除外）并提供相关配套服务；以直销方式销售化妆品、保洁用品（不涉及国营贸易管理商品，涉及配额、许可证管理商品的，按国家有关规定办理申请）。【依法须经批准的项目，经相关部门批准后方可开展经营活动】

### 股东及出资信息
股东及出资信息截止2014年2月28日。2014年2月28日之后工商只公示股东姓名，其他出资信息由企业自行公示。

| 序号 | 股东名称 | 股东类型 | 证照/证件类型 | 证照/证件号码 | 详情 |
|------|----------|----------|----------------|----------------|------|
| 1 | 美乐家中国有限责任公司 | 外国(地区)企业 | 其他 | W23822 | 查看 |

共查询到 1 条记录 共 1 页    首页 | 上一页 | 1 | 下一页 | 末页

### 主要人员信息
共计 3 条信息

THOMAS KE...    JERRY LEE FE...    McKay Christ...
执行董事         监事              总经理

关注
订阅
异议
返回

### 分支机构信息
共计 12 条信息<<查看全...

# Melaleuca (China) Wellness Products Co., Ltd.     Existing (in operation, in business, registered)

Unified Social Credit Code: 91310000751458612
Legal Representative: Thomas Kendall Knutson
Registration Authority: Shanghai Administration for Industry and Commerce
Date of Establishment: June 19, 2003

Information about Business License

- Unified Social Credit Code: 91310000751458612
- Type: Limited liability company (solely owned by a foreign corporation)
- Registered Capital: USD12.01 million
- Term of Operation Starting on: June 19, 2003
- Registration Authority: Shanghai Administration for Industry and Commerce
- Registration Status: Existing (in operation, in business, registered)
- Domicile: Factory Building No. 16, Longyang Industrial Park, 1515 Yuandong North Road, Fengpu, Fengxian District, Shanghai
- Business Scope: Development and production of cleaning products, dish washing detergents, personal cleaning products, cosmetics and wellness products; selling of self-produced products, and provision of consulting services for use of products and introduction of functions; import and export, wholesale, retail and commissioned sale (excluding auction) of commodities within the same categories as self-produced products, sanitation products, pet products, stationery, electronic appliances, cookware, textile, accessories, bags and suitcases, healthcare products (for dealing by branches only), prepackaged foods, and pet foods, and provision of relevant ancillary services; direct selling of cosmetics and cleaning products (involving no commodities subject to state trading administration, and requiring application in accordance with the relevant regulations of the state for commodities subject to quota or license administration). [Business operations subject to approval according to law may be conducted only after approval by the relevant authority.]

- Enterprise name: Melaleuca (China) Wellness Products Co., Ltd.
- Legal representative: Thomas Kendall Knutson
- Date of Establishment: June 19, 2003
- Term of Operation Ending on: June 18, 2033
- Date of Approval: June 19, 2003

Information about Shareholders and Capital Contributions        Information about shareholders and capital contributions was published until February 28, 2014, after which only the names of shareholders are published and other information about capital contributions may be published by enterprises at their sole discretion.

| No. | Name of Shareholder | Type of Shareholder | Type of License/Certificate | License/Certificate Number | Details |
|-----|---------------------|---------------------|-----------------------------|----------------------------|---------|
| 1 | Melaleuca of China, LLC | Foreign enterprise | Others | W23822 | [Omitted] |

Information about Key Personnel

| Thomas Kendall Knutson | Jerry Lee Felton | McKay Christensen |
|------------------------|------------------|-------------------|
| Executive Director | Supervisor | General Manager |

bj-62751 v2

# EXHIBIT F



**SURUHANJAYA SYARIKAT MALAYSIA**
**COMPANIES COMMISSION OF MALAYSIA**
( Agensi di bawah KPDNKK )

1 / 5

Although all efforts has been carried out to ensure that the information provided is
accurate and up to date, the Registrar of Companies will not be liable for any losses
arising from any inaccurate or omitted information

## CORPORATE INFORMATION

| | |
|---|---|
| Company Name | : MELALEUCA SOUTHEAST ASIA (MALAYSIA) SDN. BHD. |
| Last Old Name | : Nil |
| Date of Change | : Nil |
| Company Number | : 861440-H |
| Incorporation Date | : 19-06-2009 |
| Registration Date | : Nil |
| Type | : LIMITED BY SHARES |
| | : PRIVATE LIMITED |
| Status | : EXISTING |
| Registered Address | : SUITE 13.03, 13TH FLOOR |
| | MENARA TAN & TAN |
| | 207 JALAN TUN RAZAK |
| | KUALA LUMPUR |
| | WILAYAH PERSEKUTUAN |
| Postcode | : 50400 |
| Origin | : MALAYSIA |
| Business Address | : UNIT B-10-3A & 5, LEVEL 10, BLOCK B |
| | MENARA UOA BANGSAR |
| | NO. 5, JALAN BANGSAR UTAMA 1 |
| | KUALA LUMPUR |
| | WILAYAH PERSEKUTUAN |
| Postcode | : 59000 |
| Nature of Business | : DISTRIBUTION AGENT OF HEALTHCARE AND CONSUMER PRODUCTS. |



**SURUHANJAYA SYARIKAT MALAYSIA**
**COMPANIES COMMISSION OF MALAYSIA**
( Agensi di bawah KPDNKK )

2 / 5

## SUMMARY OF SHARE CAPITAL

Company Name          : MELALEUCA SOUTHEAST ASIA (MALAYSIA) SDN. BHD.
Company Number        : **861440-H**

| TOTAL ISSUED (RM) 5,000,000.00 | CASH | OTHERWISE THAN CASH |
|---|---|---|
| ORDINARY | 5,000,000 | 0 |
| PREFERENCE | 0 | 0 |
| OTHERS | 0 | 0 |

Printing Date : 22-02-2018
This company information is generated from SSM e-Info Services. This information is as at 22-02-2018 11:46:46
MENARA SSMSENTRAL, NO. 7 JALAN STESEN SENTRAL 5, KUALA LUMPUR SENTRAL, 50470 KUALA LUMPUR.
Tel: 03-7721 4000    Fax: 03-2299 4411



**SURUHANJAYA SYARIKAT MALAYSIA**
**COMPANIES COMMISSION OF MALAYSIA**
( Agensi di bawah KPDNHEP )

3 / 5

## DIRECTORS/OFFICERS

Company Name        : MELALEUCA SOUTHEAST ASIA (MALAYSIA) SDN. BHD.
Company Number      : **861440-H**

| Name/Address | IC/Passport | Designation | Date of Appointment |
|---|---|---|---|
| JERRY LEE FELTON<br>9340 S. SADDLEHORN<br>IDAHO FALLS, ID 83404<br>FOREIGN | 488816135 | DIRECTOR | 02-01-2016 |
| TODD CHARLES SORENSON<br>2526 HAROLD DR.<br>IDAHO FALLS<br>ID.<br>83402 | 537217480 | DIRECTOR | 04-08-2009 |
| FONG YOKE YIN<br>44, JALAN BU 1/7<br>BANDAR UTAMA<br>47800 PETALING JAYA<br>SELANGOR | 591207-10-6214 | DIRECTOR | 19-06-2009 |
| RAJA SHAHRUL NIZAM BIN RAJA YAHYA<br>LOT 2212-H<br>KAMPUNG DELEK<br>41250 KLANG<br>SELANGOR | 871001-43-5385 | DIRECTOR | 09-05-2017 |
| TAN LEH KIAH, DATUK<br>95, LORONG TAMARIND<br>SOUTHERN PARK<br>41200 KELANG<br>SELANGOR | 511227-02-5099 | SECRETARY | 19-06-2009 |
| LIM CHIEN JOO<br>NO.55<br>JALAN SAUJANA 2<br>AMPANG SAUJANA<br>68000 AMPANG<br>SELANGOR | 800906-08-5940 | SECRETARY | 27-06-2014 |

Printing Date : 22-02-2018
This company information is generated from SSM e-Info Services. This information is as at 22-02-2018 11:46:46

MENARA SSM@SENTRAL, NO. 7 JALAN STESEN SENTRAL 5, KUALA LUMPUR SENTRAL, 50623 KUALA LUMPUR.
Tel: 03-7721 4000    Fax: 03-7721 4011



**SURUHANJAYA SYARIKAT MALAYSIA**
COMPANIES COMMISSION OF MALAYSIA
( Agensi di bawah KPDNKK )

4 / 5

## SHAREHOLDERS/MEMBERS

Company Name     : MELALEUCA SOUTHEAST ASIA (MALAYSIA) SDN. BHD.
Company Number   : **861440-H**

| IC/Passport/ Company No | Name/Company Name | Total of Share |
|---|---|---|
| - | MELALEUCA,INC | 5,000,000 |

Printing Date : 22-02-2018
This company information is generated from SSM e-Info Services. This information is as at 22-02-2018 11:46:46

MENARA SSM@SENTRAL, NO. 7 JALAN STESEN SENTRAL 5, KUALA LUMPUR SENTRAL, 50470 KUALA LUMPUR.
Tel: 03-2299 4400      Fax: 03-2299 4411



**SURUHANJAYA SYARIKAT MALAYSIA**
**COMPANIES COMMISSION OF MALAYSIA**
(Agensi di bawah KPDNKK)

5 / 5

## COMPANY CHARGES

Company Name       : MELALEUCA SOUTHEAST ASIA (MALAYSIA) SDN. BHD.
Company Number     : 861440-H

## NO INFORMATION

EXHIBIT G



# 离职证明

   兹证明 __葛南山__ 先生（香港身份证：K023229(7) / 通行证：
H0885054301）于 _2011_ 年 _4_ 月 _13_ 日至 _2017_ 年 _11_ 月 _15_ 日
在美乐家（中国）日用品有限公司担任 _总经理_ 职务，因 _个人_ 原
因于 _2017_ 年 _11_ 月 _15_ 日离职。

   特此证明。

美乐家（中国）日用品有限公司

2017 年 11 月 15 日

此证明试用于非上海户籍员工



# Resignation Certificate

This is to certify that Mr. GE Nanshan (Hong Kong ID: K023229(7) / Exit-Entry Permit: H0885054301) assumed the position of General Manager of Melaleuca (China) Wellness Products Co. Ltd between 13 April 2011 and 15 November 2017. Mr. Ge resigned on 15 November 2017 for personal reasons.

Melaleuca (China) Wellness Products Co. Ltd

15 November 2017

# EXHIBIT H

Case 4:18-cv-00036-DCN   Document 47-3   Filed 02/26/18   Page 61 of 66

2017年直销行业最全业绩排行出炉，你关心的排第几？_直销网-中国直销杂志官方...   Page 1 of 5

| 搜索 |
| --- |

首页　　直销资讯　　杂志文萃　　策划报告　　电子杂志　　出版中心　　投稿平台　　投诉平台　　关于我们

当前位置：直销网>>杂志>>

## 2017年直销行业最全业绩排行出炉，你关心的排第几？

发布人：　　来源：　　发布时间：2018-07-03 15:20

本榜单刊登于《知识经济·中国直销》，更多详细内容敬请关注本杂志。

版权所有，转载请联系本网站或本刊，谢谢合作。

策划/执行：《知识经济·中国直销》杂志

世界直销（中国）研究中心

直销百科网

热门文章

中国原妆氏药局 记善老仪注关工作招聘通知 | 2017.11

安利营养餐食大调查 高生命脂防质的提示 | 6.12.27

完美用清东森年商代武侯屏 期间还没明年生 | 2016.2.25

2018年度直销企业业绩排行榜 | 2016.0.71

长在商品直大学学术班论式大创新班 | 5股 | 2016.26

郎里智力铁保碳口米成得新高3 17名曾生家法 | 2016.0.71

安利直销量质易特保持 提未来得行代现安利成 | 1.22.13

权限已经营商各源推自 就成为始1家企法待金 | 1.16.76

杂志提失存 2013年前领直销企业法排榜商 | 10.7.12

安利十大国商业务路径 中国业绩及器维成长 | 10.7.21



策划报告　　　　　　　　　更多>>



新浪微博

中国直销杂志　　业氏栾中区

加关注

【英罗集团强劲推出人才储备计划】2017年开年伊始，英罗强劲推出行业重大规模，高瞻前瞻的年度人才储备计划，面向市场、面向经销商人、面向计画落实的时代趋势，确立了一整套人才遇选、锁养、培训、发射面金动的有效机制，金大打造高兼业、高速效、高品位，信念恒定，服从远大的人才精英队伍。





热门企业搜索　　热门人物搜索　　热门团队搜索

　　截至2018年1月25日，根据《知识经济·中国直销》杂志助年度商务招直销行业信息管理系统发布数据进行的统计，中国已经发现《直销经营许可证》且获得官方公示的直销企业有91家，比公示中备齐明但还未获得牌照企业的准直销企业共计40家，因此中国直销行业最终的享牌企业和申牌企业数量共计138家。

　　据本刊统计，2017年度，90家获牌直销企业一共创造了2179.83亿元业绩，相比2016

Case 4:18-cv-00036-DCN   Document 47-3   Filed 02/26/18   Page 62 of 66

2017年直销行业最全业绩排行出炉，你关心的排第几？_直销网-中国直销杂志官方...   Page 2 of 5

元，与去年相比有略微增长。其中，有41家企业业绩上涨，有37家企业业绩下降，业绩下降企业比例也是创下了中国直销行业有业绩统计以来的历史之最。

这些直销企业的平均业绩为24.77亿元，相对于2016年的27.6亿元下降2.83亿元，相对于2015年的29.2亿元下降4.43亿元。这是由于自2015年来，商务部新审批的直销企业超过30家，这些企业大部分处于探索和蓄势阶段，且前业绩基数较小。未来随着这些企业的不断发展，中国直销行业的整体业绩或将呈现出全额的增长。（参见表1）

有关2017年中国直销企业业绩更多详细数据以及分析，请持续关注知识经济杂志官方微信（微信号：uprich_com），或登陆知识经济杂志官方网站（www.uprich.com），或参见《知识经济·中国直销》杂志2017年2月刊（订阅电话023-83658882），我们对直销行业的整体发展状况以及每一家企业的经营状况做了详细盘点，以供业界参考。

中国直销 Powerd by uprich.com 2012-2015

http://uprich.com/index.php?m=Index&a=article&id=5899&type=1         2/23/2018

2017年直销行业最全业绩排行出炉，你关心的排第几？　直销网-中国直销杂志官方...　Page 3 of 5

**表1　2017年度中国直销90家业绩排行榜**

| 排名 | 公司名称 | 2017业绩 | 2016业绩 | 名次 | 变化 | 业绩变化 | 增幅 |
|---|---|---|---|---|---|---|---|
| 1 | 无限极(中国) | 249 | 270 | 1 | 0 | -21 | -7.78% |
| 2 | 安利(中国) | 230 | 230 | 2 | 0 | 0 | 0.00% |
| 3 | 完美(中国) | 200 | 220 | 3 | 6 | -20 | -9.1% |
| 4 | 权健 | 176 | 192 | 4 | 0 | -16 | -8.33% |
| 5 | 玫琳 | 100 | 75 | 8 | 1 | 25 | 33.33% |
| 6 | 玖康凯(中国) | 95 | 95 | 6 | 0 | 0 | 0.00% |
| 7 | 新时代 | 91 | 93 | 7 | 0 | -2 | -2.15% |
| 8 | 中脉 | 80 | 120 | 5 | -3 | -40 | -33.33% |
| 9 | 康婷 | 79 | 70 | 9 | 0 | 9 | 12.86% |
| 10 | 隆力奇(中国) | 64 | 70 | 9 | -1 | -6 | -8.57% |
| 11 | 华信 | 69 | 65 | 11 | 0 | 5 | 7.69% |
| 12 | 如新(中国) | 54 | 49 | 12 | 0 | 5 | 10.20% |
| 13 | 美乐家(中国) | 50 | 23.4 | 21 | 3 | 26.6 | 113.63% |
| 14 | 理约 | 40 | 3 | 49 | 35 | 37 | 1713.37% |
| 15 | 春甜 | 34 | 34.8 | 15 | 0 | 3.2 | 9.20% |
| 16 | 爱茵 | 36 | 40 | 14 | -2 | -4 | -10.00% |
| 17 | 三生(中国) | 35 | 16 | 27 | 10 | 19 | 118.75% |
| 17 | 金天国际 | 35 | 21 | 22 | 5 | 14 | 66.67% |
| 19 | 罗莱 | 32 | 45 | 13 | -6 | -13 | -28.89% |
| 20 | 长青(中国) | 30 | 4 | 44 | 24 | 26 | 650.00% |
| 21 | 宝健(中国) | 29 | 20 | 24 | 3 | 9 | 45.00% |
| 22 | 龙凤神 | 22 | 28 | 17 | -5 | -6 | -21.43% |
| 23 | 伊之源 | 21.8 | 18 | 26 | 3 | 3.8 | 21.11% |
| 24 | 天福天然山 | 20 | 1.8 | 60 | 36 | 18.2 | 1011.11% |
| 25 | 珠海 | 19.5 | 1.5 | 61 | 36 | 18 | 1200.00% |
| 26 | 膳留 | 17.12 | 16 | 27 | 1 | 1.12 | 7.00% |
| 27 | 隆力加 | 17 | 26 | 19 | -8 | -9 | -34.62% |
| 27 | 当然 | 17 | 20.6 | 23 | -4 | -3.6 | -17.48% |
| 29 | 安惠 | 16.25 | 12.5 | 30 | 1 | 3.75 | 30.00% |
| 30 | 繁茂 | 16 | 15 | 29 | -1 | 1 | 6.67% |
| 31 | 佳莱 | 15 | 28 | 17 | -14 | -13 | -46.43% |
| 32 | 欧瑞莲(中国) | 14.8 | 9.5 | 35 | 3 | 5.3 | 55.79% |
| 33 | 静力 | 12 | 10 | 33 | 0 | 2 | 20.00% |
| 33 | 北方大陆 | 10 | 4 | 44 | 10 | 6 | 150.00% |
| 35 | 哈维川邦 | 9.7 | 8.9 | 37 | 2 | 0.8 | 8.99% |
| 36 | 自主力比尔 | 9.5 | 12 | 31 | -5 | -2.5 | -20.83% |
| 37 | 婚华国际 | 9 | 25 | 20 | -17 | -16 | -64.00% |
| 37 | 富迪科(中国) | 9 | 12 | 31 | -6 | -3 | -25.00% |
| 37 | 云八13乐 | 9 | 10 | 33 | -4 | -1 | -10.00% |
| 40 | 克明(中国) | 8 | 20 | 24 | -16 | -12 | -60.00% |
| 40 | 富商 | 8 | 7.5 | 38 | -2 | 0.5 | 6.67% |
| 40 | 服务引 | 8 | 0.8 | 67 | 27 | 7.2 | 900.00% |
| 43 | 天狮中国区 | 7.5 | 36 | 16 | -27 | -29 | -74.00% |
| 44 | 吕美生物 | 6.5 | —— | 70 | 35 | —— | —— |
| 45 | 大森吻的奶(中国) | 5.5 | 2.5 | 52 | 7 | 3 | 120.00% |
| 46 | 梦麻 | 5.3 | 4.93 | 42 | -4 | 0.37 | 7.51% |
| 47 | 卫诗 | 5 | 9.5 | 35 | -11 | -4.5 | -47.37% |
| 48 | 乔川伴名 | 4.5 | 1 | 64 | 16 | 3.5 | 350.00% |
| 49 | 福寿良 | 4 | 4.5 | 41 | -6 | -0.5 | -11.11% |
| 49 | 九铁 | 4 | 3.5 | 47 | -2 | 0.5 | 14.29% |
| 51 | 和山百思 | 3.8 | 2.4 | 54 | 3 | 1.4 | 58.33% |
| 52 | 春艺堂 | 3.6 | 2.5 | 52 | 0 | 1.1 | 44.00% |
| 53 | 福银舞 | 3.01 | 2 | 57 | 4 | 1.01 | 50.50% |
| 54 | 摩莱堡 | 3 | 1.5 | 61 | 7 | 1.5 | 100.00% |
| 55 | 福银达 | 2.5 | 2 | 57 | 2 | 0.5 | 25.00% |
| 55 | 自然阳光 | 2.5 | —— | 79 | 24 | —— | —— |
| 57 | 欧中和 | 2.3 | 2.1 | 56 | 1 | 0.2 | 9.52% |
| 58 | 罗纳人 | 2 | 3 | 49 | -9 | -1 | -33.33% |
| 58 | 金利乐益(中国) | 2 | 1.2 | 63 | 5 | 0.8 | 66.67% |
| 58 | 蕊宝 | 2 | —— | 79 | 21 | —— | —— |
| 61 | 富勒 | 1.6 | 2.2 | 55 | -6 | -0.6 | -27.27% |
| 62 | 东阿阿胶 | 1.5 | 0.5 | 71 | 9 | 1 | 200.00% |
| 63 | 永康生物 | 1.2 | 2.8 | 51 | -12 | -1.6 | -57.14% |
| 64 | 芝原 | 1 | 6 | 39 | -25 | -5 | -83.33% |
| 64 | 食本 | 1 | 5.3 | 40 | -24 | -4.3 | -81.13% |
| 64 | 紫竹科技 | 1 | 2 | 57 | -7 | -1 | -50.00% |
| 64 | 器生 | 1 | 0.9 | 65 | 1 | 0.1 | 11.11% |
| 64 | 海之星 | 1 | 0.8 | 67 | 1 | 0.2 | 25.00% |
| 64 | 乐为红 | 1 | 0.7 | 69 | 5 | 0.3 | 42.86% |
| 64 | 顺灯 | 1 | 0.23 | 74 | 10 | 0.77 | 334.78% |

Case 4:18-cv-00036-DCN    Document 47-3    Filed 02/26/18    Page 64 of 66

2017年直销行业最全业绩排行出炉，你关心的排第几？_直销网-中国直销杂志官方...    Page 4 of 5

## 2017 年中国直销申牌企业一览表

| 排名 | 企业 | | | |
|---|---|---|---|---|
| 91 | | | | |
| 92 | | | | |
| 93 | | | | |
| 94 | | | | |
| 95 | | | | |
| 96 | | | | |
| 97 | | | | |
| 98 | | | | |
| 99 | | | | |
| 100 | | | | |
| 101 | | | | |
| 102 | | | | |
| 103 | | | | |
| 104 | | | | |
| 105 | | | | |
| 106 | | | | |
| 107 | | | | |
| 108 | | | | |
| 109 | | | | |
| 110 | | | | |
| 111 | | | | |
| 112 | | | | |
| 113 | | | | |
| 114 | | | | |
| 115 | | | | |
| 116 | | | | |
| 117 | | | | |
| 118 | | | | |
| 119 | | | | |
| 120 | | | | |
| 121 | | | | |
| 122 | | | | |
| 123 | | | | |
| 124 | | | | |
| 125 | | | | |
| 126 | | | | |
| 127 | | | | |
| 128 | | | | |
| 129 | | | | |
| 130 | | | | |
| 131 | | | | |
| 132 | | | | |
| 133 | | | | |
| 134 | | | | |
| 135 | | | | |
| 136 | | | | |
| 137 | | | | |
| 138 | | | | |

其中，年内新增的有当当、经活美地、益宝、同仁堂、沃德绿世界、自然阳光、吉美生物、永健、清庭生物、以岭药业等10家获牌直销企业。新增29家未表申图声明的企业。

在拿到90家牌企业中，有3家基本没有直销业绩。来自韩国的爱茉莉和日本的宝丽一直没有见到中国直销的入门法则，基本没有开展直销业务，而哈药集团因此止未捷，几乎前的就主动退出了直销经营。

2017年，中国直销行业面临史上罕见的挑战，包括在年轻化、网络化方面的探索仍未获得整体突破，包括是要不要开设店铺、产品导向还是事业导向、大单还是小单等方面的纠结，包括在收往压力下的大规模合作事业部出局，包括康宝莱、安利家军等功勋负责人的隐跌离席，包括面对新零售和微商的躁动，包括应对虚拟货币、资金盘、公益盘的一场场背书……

当然，中国直销行业这一年也取得了一些积极的共识，就是更加理性地抵制骗局营销、看道进行系统化健康管理升级以及在小单新零售方面的尝试获得一定突破。

在各方面下抚特别严厉的情况下，中国直销企业以实际需求为基础，稳定了市场，并取得一定的发展。

自2008年开始，《知识经济·中国直销》杂志一直致力于在每年年初强家推出中国直销企业业绩报告，并对业绩背后的企业发展战略做深入解读，以供业界参考。此后，我们联合世界直销（中国）研究中心和直销百科网共同制作该排行榜。共同的力量让这

2017年直销行业大企业绩排行出炉，你关心的排第几？ _直销网-中国直销杂志官方... Page 5 of 5

现在，此报告已经连续发布日年，其间经历了坎坷诚新和考验，但我们依然坚持为奋斗在中国直销行业的各界人士提供尽可能真实、客观、有效、有意义的行业报告，以记录中国直销行业的发展和进程。

报告中的每一个数据，本刊均征集了二个以上的来源互相佐证，并征求大量思界直销（中国）研究中心专家委员的意见判断，以选取最可能泰近真实的数据呈现给行业。在此感谢业界朋友对这应报告制作过程中的理解和帮助。

展望2018年，我们渴望更多的直销碑起，但更渴望一个稳定的行业未来。

这些未来系于今天的所有业界人士身上：

没有规范，就没有未来；

没有健康，也没有未来！

1/1 页

**相关新闻：**

- 总真竞争力
- 工作室
- 发改重安
- 直销企业的红色基因
- 2013年度前级直销企业选择宝料

分享到：
0

**评论专区：（所有评论）有0条评论**

用户名：

有   题：

[ 发表评论 ]   网友评论仅供其表达个人看法，并不表示本网站同意或支持其观点。

**2017 Performance Ranking Report of the Direct Selling Industry Is Now Released; What is the Ranking of the [Company] You Care For?**

Time of Publication: February 5, 2018

According to the calculation by our magazine, in 2017, the 90 licensed direct selling companies achieved a performance of RMB 217.983 billion, a 1.27% increase from the RMB 215.261 billion in 2016.

**Table 1: 2017 Ranking of the 90 Leading Direct Selling Companies in China**

(Ranking is based on annual performance, which is listed below in RMB 100 million, unless specified otherwise)

| 2017 Ranking | Company Name | 2017 Performance | 2016 Performance | 2016 Ranking | Ranking Change | Amount of Growth | Growth Rate |
|---|---|---|---|---|---|---|---|
| 13 | Melaleuca (China) | 50 | 23.4 | 21 | 8 | 26.6 | 113.68% |

Starting from 2008, *Knowledge Economy* published its annual performance report on direct selling companies in China, offering detailed insight into the development strategies of direct selling companies in China for the industry's reference.

For each data in this report, our magazine has compared information from more than three sources and sought comments from many experts associated with the World Direct Selling (China) Research Institute, so as to present to the industry data that are closest to reality.